EDWARD R. KNIGHT, DONALD M. KAPLAN, MARVIN Z. WALLEN AND ATLANTIC COUNTY MUNICIPAL COURT JUDGES' ASSOCIATION, PLAINTIFFS-RESPONDENTS, v. CITY OF MARGATE, CITY OF VENTNOR, FOLSOM BOROUGH, CITY OF ABSECON, DEFENDANTS, AND JOHN J. DEGNAN, ATTORNEY GENERAL OF THE STATE OF NEW JERSEY, DEFENDANT-APPELLANT.

Argued April 6, 1981—Decided June 25, 1981.

*Erminie L. Conley,* Assistant Attorney General, argued the cause for appellant (*James R. Zazzali,* Attorney General of New Jersey, *Stephen Skillman,* Assistant Attorney General, of counsel, *Richard J. Murphy,* on the briefs).

*Edwin J. Jacobs, Jr.* argued the cause for respondents (*Tort, Jacobs, Gross, Rosenberger & Todd,* attorneys); *Edwin J. Jacobs, Jr.* and *Alan M. Lands,* on the brief).

The opinion of the Court was delivered by

HANDLER, J.

In 1980 the Legislature amended the New Jersey Conflicts of Interest Law, *N.J.S.A.* 52:13D–12 *et seq.,* to prohibit certain public officials and employees, including members of the judiciary, from dealings with casinos. *L.* 1980, *c.* 79; *N.J.S.A.*

52:13D–16, 17.1. The prohibition against such dealings was to apply also to persons with whom such officials and employees are associated and extends for a two-year period following the termination of public office or employment. This case contests the application of the prohibition to municipal court judges and challenges its constitutionality as applied to the judiciary.

## I

The action was brought by several attorneys, who were formerly part-time municipal court judges in Atlantic County and the Atlantic County Municipal Court Judges' Association. It was asserted by plaintiffs that in their capacity as attorneys they have had, and expect to continue to have, dealings with casinos and casino interests. They contended that the statute as written did not apply to municipal court judges but only to full-time judges of the various State courts and therefore did not bar municipal court judges from engaging in these casino-related activities. Alternatively, it was contended that the statute would be unconstitutional if construed to apply to any member of the judiciary including municipal court judges. The complaint, which was brought against the Attorney General as the officer charged with enforcing the New Jersey Conflicts of Interest Law and several municipalities in which plaintiffs served as magistrates, further alleged that the individual plaintiffs have resigned their positions as municipal court judges in order to avoid any sanctions under or any appearance of violation of chapter 79.[1]

On cross-motions for summary judgment, the trial court determined that the statute, as properly construed, applied to municipal court judges, but that it was unconstitutional because judges of the municipal court are members of the judiciary and

---

[1]Plaintiffs would not individually be directly affected by the outcome herein, since they resigned their judgeships before the effective date of the amendatory act and therefore would not fall within any of the Act's proscriptions.

therefore the statutory regulation impinged upon the Supreme Court's exclusive authority over the courts and judges in this State. The trial judge also dismissed the cause of action against the defendant municipalities. The Attorney General filed a notice of appeal which this Court certified directly.

Following the oral argument of the appeal before this Court there was enacted into law on May 14, 1981, *Senate Bill No. 3041, L.* 1981, *c.* 142, which amended both *N.J.S.A.* 5:12–102 and 5:12–117.1 of the Casino Control Act, *N.J.S.A.* 5:12–1 *et seq.,* and the New Jersey Conflicts of Interest Law, superseding *L.* 1980, *c.* 79, the subject of this litigation. The earlier legislation had included within the definition of the public officials subject to its prohibitions "any member of the . . . Judiciary." *L.* 1980, *c.* 79, § 2(a); *N.J.S.A.* 52:13D–17.1(a). The most current enactment changes the coverage of the ethical prohibitions of the Conflicts of Interest Law by including within its restrictions only full-time members of the judiciary and municipal judges in Atlantic City. *N.J.S.A.* 52:13D–17.2. Since the new legislation still purports to regulate the activity of judges, it does not moot the current appeal although the statutory shift in focus necessarily requires a reformulation of the issues now to be resolved. These issues are (1) whether members of the judiciary, and, specifically, municipal court judges, are subject to the New Jersey Conflicts of Interest Law; (2) if the statute is construed as covering members of the judicial branch of government, whether it is unconstitutional as being in conflict with the Supreme Court's constitutional authority to regulate the judiciary and the practice of law; and (3) if the statute as now written does not cover all members of the judiciary, the wisdom of extending ethical restrictions against casino activities, comparable to those in the statute, to such judges who do not fall within the provisions of the Conflicts of Interest Law.

## II

■ The ethical restrictions of which plaintiffs complain, as originally imposed by *L.* 1980, *c.* 79, and continued by *L.* 1981, *c.*

142, relate to dealings or relationships with casino entities.[2] These strictures, to be fully understood, must be addressed in the constitutional and statutory framework within which legalized casino gaming operates in this State.

Until very recently casino gaming was outlawed. Such gaming, a form of gambling, was prohibited by the Constitution. *N.J.Const. (1947)*, Art. 4, § 7, par. 2. An attempt to legalize casino gaming through constitutional amendment failed in 1974 when a public question to authorize casinos was rejected by a majority of the voters at the general election in November of that year. Two years later, however, in November 1976, a majority of the voters approved casino gambling by voting in favor of an amendment to the Constitution which provided in part:

> It shall be lawful for the Legislature to authorize by law the establishment and operation, under regulation and control by the State, of gambling houses or casinos within the boundaries . . . of the city of Atlantic City, county of Atlantic . . . .

Pursuant to this constitutional mandate, the Casino Control Act was enacted by the Legislature in 1977 (*L.* 1977, *c.* 110, *N.J.S.A.* 5:12–1 to 152) to authorize casino gaming and establish the regulatory framework for the casino industry. The statutory and administrative controls over casino operations established

---

[2]The individual plaintiffs, as former municipal court judges in various Atlantic County municipalities and the members of the plaintiff Association, are vitally interested in determining the scope and application of the Conflicts of Interest Law to municipal court judges. Although the individual plaintiffs by virtue of the termination of their judicial offices prior to the enactment of the initial amendment to the Conflicts of Interest Law, *L.* 1980, *c.* 79, avoided its restrictions, this may not be true for members of the Association. Moreover, notwithstanding the further changes in the statute's coverage effected by *L.* 1981, *c.* 142, the plaintiffs might be indirectly affected by the Court's resolution of the controversy. Furthermore, the public concern in the judicial solution of this matter is strong and obvious. We conclude therefore that this litigation has been brought by parties with a stake in the outcome, coincident with a powerful public interest, sufficient to demonstrate their standing to sue. *N. J. Chamb. Commerce v. N. J. Elec. Law Enforc. Comm.*, 82 *N. J.* 57, 67–69 (1980).

by the Act are extraordinary pervasive and intensive. *Cf. Bally Mfg. Corp. v. N. J. Casino Control Comm'n,* 85 *N.J.* 325 (1981). Over 11 statutory articles and almost 200 separate provisions cover virtually every facet of casino gambling and its potential impact upon the public. The regulatory scheme is both comprehensive and minutely elaborate.

The Legislature took considerable pains to determine and expound the State's public policy involving casino gambling. The declaration in the Casino Control Act appropriately emphasized the importance of the tourist, resort, recreational and convention industry of the State, the need to restore, rehabilitate and redevelop Atlantic City and the potential contribution of this new industry to the economic structure, general welfare, health and prosperity of the State and its inhabitants. *N.J.S.A.* 5:12–1(b)(1)–(5). The Legislature underscored the uniqueness of the new gambling industry by recognizing that the public, which has a "vital interest in casino operations ... established an exception to the general policy of the State" against private gambling, and therefore determined casino gambling to be a revocable, highly regulated and conditioned privilege. *N.J.S.A.* 5:12–1(b)(8).

At the very heart of the public policy embraced by the new law is "the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations." *N.J.S.A.* 5:12–1(b)(6). Related directly to this purpose, the Legislature stated that "the regulatory provisions ... are designed to extend strict State regulation to all persons ... practices and associations related to" casinos and that "comprehensive law-enforcement supervision ... is further designed to contribute to the public confidence and trust in the efficacy and integrity of the regulatory process." *Id.* Because of the need for integrity, public confidence and trust, it was stressed that not only persons with criminal backgrounds and associations but also persons "deficient in business probity" should be excluded

from casino gaming operations. *N.J.S.A.* 5:12–1(b)(7). In this vein, because casino operations "are especially sensitive and in need of public control and supervision," the statute dictates that "the regulatory and investigatory powers and duties shall be exercised to the fullest extent consistent with law to avoid the entry" into casino operations, directly or indirectly, of persons whose economic or occupational pursuits are violative of the "criminal or civil public policies of this State." *N.J.S.A.* 5:12–1(b)(9). These public policy objectives were augmented by later amendments which declared that even though "[c]ontinuity and stability in casino gaming operations" were important, these could not be achieved by allowing persons with "unacceptable backgrounds and records of behavior" to control casinos. *N.J.S.A.* 5:12–1(b)(15); *L.* 1978, *c.* 7, § 1.

An entire section of the Act, Article 3, imposed stringent ethical restrictions upon members and employees of the agencies established to regulate casino operations, the New Jersey Casino Control Commission and the Division of Gaming Enforcement. *N.J.S.A.* 5:12–58 to *N.J.S.A.* 5:12–62. In addition to specific prohibitions, the New Jersey Conflicts of Interest Law was made applicable. *N.J.S.A.* 5:12–59. Article 3 also directed the Casino Control Commission to adopt a Code of Ethics modeled upon the judicial code of ethics of the New Jersey Supreme Court. *N.J.S.A.* 5:12–59(b).

In 1980 the Legislature extended the ethical restrictions applicable to casino operations to persons other than commission and division members and employees.[3] This enactment amended the Conflicts of Interest Law and imposed limitations upon dealings between high level government officials and casino licensees or

---

[3]The parties point out in their briefs that the enactment of *L.* 1980, *c.* 79, was prompted by the revelations of a federal investigation which resulted in charges and indictments of various public officials for corruption and bribery. Popularly referred to as the "Abscam" prosecution, some of the allegations related to casino activities and interests.

applicants. *L.* 1980, *c.* 79.[4]  Specifically, Section 2(a) of the statute covered the following individuals:

> ... State officers or employees subject to disclosure by law or executive order; special State officers and employees; the Governor; *any member of the* Legislature or *Judiciary*; any member of the governing body, or the municipal attorney of a municipality wherein a casino is located; any member of or attorney for the planning board or zoning board of adjustment of a municipality wherein a casino is located, or any professional planner regularly employed by the planning board or zoning board of adjustment. (emphasis added)

Under this provision, for the first time, the Conflicts of Interest Law was applied to "any member of the ... Judiciary." Chapter .79 was replaced by *L.* 1981, *c.* 142, on May 14, 1981. Under the terms of the most recent amendment the application of the conflicts law to the judiciary is limited to "any ... full time member of the Judiciary" and to "the municipal judge ... of a municipality wherein a casino is located."

The initial issue, then, in this appeal involves the meaning of the term "judiciary" as used in the New Jersey Conflicts of Interest Law as most recently amended and, more specifically, whether the legislative reference to the "judiciary" encompasses municipal court judges.  Plaintiffs have argued that the term "judiciary" under the New Jersey Conflicts of Interest Law, as originally provided by *L.* 1980, *c.* 79, did not include municipal court judges.  Their argument on this point is still relevant even though the current statute, *L.* 1981, *c.* 142, restricts the basic coverage of the Conflicts of Interest Law to members of the judiciary who are "full time."  The assertion is important in

---

[4]The prohibitions contained in this amendment to the Conflicts of Interest Law were limited solely to the casino gaming industry.  They barred a covered person from employment by or representation of a casino licensee or applicant, or acquisition of more than one percent interest in such a casino, and imposed these restrictions for two years following termination of public office.  *N.J.S.A.* 52:13D–17.1(b).  The restrictions also bar acceptance of special favors from casino licensees or applicants or the attempt to influence licensing proceedings.  *N.J.S.A.* 52:13D–17.1(c), (d).  The statute imposed a fine of $500 and/or imprisonment of up to six months on offenders.  *N.J.S.A.* 13D–17.1(e).  Although coverage of the new amendment has since been altered, its prohibitions remain the same.  *N.J.S.A.* 52:13D–17.2.

that it is determinative as to whether *full-time* municipal court judges throughout the State would fall within the scope of the present statute, as well as other full-time judges and, by specific inclusion, the municipal court judge or judges of the municipality wherein casinos are located and operate, namely, Atlantic City.

Plaintiffs' contentions were based primarily upon Art. VI, § 6, par. 1, of the New Jersey Constitution, which states in pertinent part that "[t]he Governor shall nominate ... the Chief Justice and Associate Justices of the Supreme Court, the Judges of the Superior Court, and the judges of the inferior courts *with jurisdiction extending to more than one municipality.*" [Emphasis added]. Plaintiffs have reasoned that the constitution defines the judiciary under this clause as consisting of only the judicial officials specifically enumerated therein and that the New Jersey Conflicts of Interest Law employs this term with the same meaning.

This constitutional provision, however, does not fix the boundaries of the State's judiciary nor does it answer the inquiry as to whether municipal court judges are members of the judiciary for purposes of the New Jersey Conflicts of Interest Law. Rather, the constitutional provision that deals more fundamentally with defining and identifying the judicial branch of government is Art. VI, § 1, par. 1. This provision conveys a far broader and more flexible meaning to the term "judiciary," stating that "[t]he judicial power shall be vested in a Supreme Court, a Superior Court, *and other courts of limited jurisdiction.*" The Constitution thus refers to the judicial branch of government in the primary and basic sense of the *judicial powers* of government. Membership in the judiciary can be understood in terms of a functional relationship to the judicial power as vested by the Constitution and, in that sense, the judiciary takes on a broader meaning than suggested by the plaintiffs.

Court decisions have consistently held that "[t]he municipal court, as an inferior court of limited jurisdiction, shares in this single [judicial] power," *Kagan v. Caroselli*, 30 *N.J.* 371, 377 (1959); see also *In re Mattera*, 34 *N.J.* 259, 266 (1961); *Krieger v. Jersey City*, 27 *N.J.* 535, 541–542 (1958); *Upper Penns Neck Tp. v. Lower Penns Neck Tp.*, 20 *N.J.Super.* 280, 284 (Law Div.1952). As recognized by the trial court in this case, municipal courts are an integral part of the statewide judicial system. Municipal court judges have been uniformly treated as members of the judiciary, since such judges share and exercise the judicial power. *E. g., In re Yengo*, 72 *N.J.* 425 (1977); *In re Hardt*, 72 *N.J.* 160 (1977); *In re Mattera, supra.* This interpretation also reflects the Legislature's general understanding that the State's municipal court judges are members of the judiciary and vital constituents of the State's justice system. *Cf. N.J.S.A.* 2A:1B–1 *et seq.; In re Yengo, supra.*

Accordingly, given the strong public policy expressed in the Casino Control Act, the acute vulnerability of the Casino industry, and the evident legislative purpose to eliminate even the appearance of impropriety or conflict involving public officials in all walks of government, there is no basis for believing that the Legislature in enacting *L.* 1980, *c.* 79, did not intend to include within its strictures the judges of the various municipal courts throughout the State together with other members of the judiciary. The same basic reasons exist for believing that in the superseding enactment, *L.* 1981, *c.* 142, the Legislature, though it limited the coverage of the Conflicts of Interest Law to full time judicial officers, did not intend to exclude or immunize full time municipal court judges from the ethical obligations it placed upon all other full-time members of the Judiciary.[5]

_____

[5]The Legislature's singling out of municipal court judges in Atlantic City in *L.* 1981, *c.* 142, is completely understandable and does not evince a purpose to treat municipal court judges, at least those who are full time, differently from other judges. The Legislature obviously wanted to be absolutely certain to

■ The present law, *L.* 1981, *c.* 142, as noted earlier, not only narrowed coverage to full-time members of the judiciary, it also specifically included within its restrictions the municipal judge "... of a municipality wherein a casino is located." The latter reference relates only to the City of Atlantic City. We conclude accordingly that the intendment of the Legislature in enacting the currently operative New Jersey Conflicts of Interest Law as it relates to the casino gaming industry, was to include within its scope, along with the full-time members of the judiciary, both full-time municipal court judges located in any municipality within the State as well as any full-time or part-time municipal judge within the City of Atlantic City.[6]

III

The application of the Conflicts of Interest Law to all full-time members of the Judiciary, including municipal court judges, and to the municipal court judges of Atlantic City, raises the issue as to the constitutionality of the statute's ethical bar as it affects judges. It is claimed that Art. VI, § 2, par. 3, of the New Jersey Constitution precludes the Legislature from enacting any laws that purport to govern the ethical conduct of the judiciary or persons admitted to the practice of law. That section provides:

The Supreme Court shall make rules governing the administration of all courts in the State and, subject to law, the practice and procedure in all such courts. The Supreme Court shall have jurisdiction over the admission to the practice of law and the discipline of persons admitted.

The trial court assumed in this case that since this Court possesses the constitutional authority to prescribe and enforce standards of conduct for judges and attorneys, this necessarily implies an absence of any authority on the part of the other branches of government to deal with the subject.

---

include Atlantic City municipal court judges in the statute. Without a specific inclusion, coverage might be questioned.

6Presently, there is one full-time judge and one part-time judge in Atlantic City.

The power of the Supreme Court in the judicial domain flows from and is vested by organic law. It is necessarily paramount and exclusive as to matters that are central to the judiciary. The Court's authority with respect to the administration of the courts is far-reaching; it encompasses the entire judicial structure and necessarily covers all aspects and incidents related to the justice system. *Winberry v. Salisbury*, 5 *N.J.* 240 (1950), *cert.* den. 340 *U.S.* 877, 71 *S.Ct.* 123, 95 *L.Ed.* 638 (1950).

The Constitutional judicial power also confers authority upon the Supreme Court over a wide range of conduct on the part of members of the Bar. See *In re Mattera, supra,* 34 *N.J.* at 263–265. It is, further, a source of authority to regulate the conduct of members of the judiciary. *Id.* at 264–271. The Court's constitutional power over the judiciary and admission to the practice of law is not limited to adjudicating individual charges of alleged misconduct but extends as well to the adoption of rules of general application governing the conduct of judges and attorneys. See, *e. g.,* Code of Judicial Conduct, Canons 1, 2A, 3A–B, 5–7; DR 1–102, 2–101 *et seq.,* 5–101 *et seq.,* 8–101 *et seq.,* 9–101 *et seq.; In re LiVolsi,* 85 *N.J.* 576 (1981); *American Trial Lawyers v. N. J. Supreme Court,* 66 *N.J.* 258 (1974).

In this case the challenged legislation affects the conduct of judges as public officials and as attorneys upon the termination of public office. It thus implicates matters that are constitutionally committed to the Supreme Court's judicial power. The resulting question, then, is whether such legislative action can be reconciled with the Supreme Court's preeminent, exclusive and extensive constitutional powers over the judicial branch of government.

This inquiry must commence with an understanding of the separation of essential governmental powers that is a part of the State's governmental structure fashioned by the Constitution. *N.J.Const.* (1947), Art. III, par. 1. Governmental checks and balances are an integrated feature of our fundamental organic

law. *Id.* It is a constitutional axiom that each branch of government is distinct and is the repository of the powers which are unique to it; the members or representatives of one branch cannot arrogate powers of another branch. The constitutional spirit inherent in the separation of governmental powers contemplates that each branch of government will exercise fully its own powers without transgressing upon powers rightfully belonging to a cognate branch. Each branch of government is counseled and restrained by the constitution not to seek dominance or hegemony over the other branches.

The constitutional doctrine of the separation of powers denotes not only independence but also interdependence among the branches of government. Indeed, the division of governmental powers implants a symbiotic relationship between the separate governmental parts so that the governmental organism will not only survive but will flourish. *E. g., State v. Leonardis,* 73 *N.J.* 360 (1977); *cf. City of Hackensack v. Winner,* 82 *N.J.* 1 (1980). "The separation-of-powers doctrine contemplates that the several branches will cooperate to the end that government will succeed in its mission." *In re Zicarelli,* 55 *N.J.* 249, 264–265 (1970), aff'd sub. nom. *Zicarelli v. Investigation Commission,* 406 *U.S.* 472, 92 *S.Ct.* 1670, 32 *L.Ed.2d* 234 (1972). See also *State v. Leonardis, supra,* 73 *N.J.* at 367–375.

It was observed in *In re Salaries Prob. Off. Bergen County,* 58 *N.J.* 422, 425 (1971) that "... the doctrine of the separation of powers was never intended to create, and certainly never did create, utterly exclusive spheres of competence. The compartmentalization of governmental powers among the executive, legislative and judicial branches has never been watertight." See also *Massett Building Co. v. Bennett,* 4 *N.J.* 53, 57 (1950). Inevitably some osmosis occurs when the branches of government touch one another; the powers of one branch sometimes take on the hue and characteristics of the powers of the others. *E. g., Mt. Laurel Tp. v. Public Advocate of N. J.,* 83 *N.J.* 522, 530–534 (1980); *State v. Leonardis, supra; David v. Vesta Co.,* 45 *N.J.* 301, 321–328 (1965). It occasionally happens that an

underlying matter defies exact placement or neat categorization; it may not always be possible to identify a subject as belonging exclusively to a particular branch. In those situations responsibility is joint and governmental powers must be shared and exercised by the branches on a complementary basis if the ultimate governmental objective is to be achieved. *E. g., State v. Leonardis, supra* (judicial and legislative); *In re Salaries Prob. Off. Bergen County, supra,* (same); *Brown v. Heymann,* 62 *N.J.* 1 (1972) (legislative and executive); *Mt. Laurel Tp. v. Public Advocate of N. J., supra* (same); *David v. Vesta, supra* (executive and judicial).

The seminal case in this State construing the nature and extent of the judicial power under Art. VI, § 2, par. 3, is *Winberry v. Salisbury, supra.* There, the Court was confronted with a statute and a conflicting court rule dealing with time to appeal, a subject involving "the practice and procedure in all . . . courts [in the State]." Art. VI, § 2, par. 3. This power, unlike the Supreme Court's rulemaking powers governing the administration of all courts, is made "subject to law" by the constitutional article. The Court interpreted this qualification as relating to "substantive" law, which is within the constitutional powers of the Legislature and which could therefore be exercised without colliding with the Supreme Court's exclusive and unqualified powers over the administration of the courts and the professional conduct of judges and members of the bar. Since the challenged legislation was not "substantive" in content, the Court held that the court rule should prevail.

Succeeding cases have made clear that while the judicial power is paramount and exclusive, it need not in every context or application be preclusive. Implicit in the decisional law is the distinction between the *existence* and the *exercise* of the judicial powers. The cases show that, although the constitutional authority of the Supreme Court over the judicial branch of government is preeminent, this does not mean that this authority must invariably foreclose action by the other branches of government. This is so particularly where the judicial power has not been

exercised or fully implemented, and where such action by the other branches serves a legitimate governmental purpose and, concomitantly, does not interfere with judicial prerogatives or only indirectly or incidentally touches upon the judicial domain.

Thus, in *Passaic Cty. Probation Officers' Assn. v. Cty. of Passaic*, 73 *N.J.* 247, 255 (1977), we recognized that the Court could, consistent with its own exclusive constitutional authority, tolerate actions of other branches of government affecting the judicial system, at least in the absence of its own actions. In *State v. Deutsch*, 34 *N.J.* 190 (1961), this Court adjudicated the validity of a statute relating to the disqualification of judges. We held that the Court had the constitutional authority to impose requirements for the disqualification of judges which exceeded those enacted by the Legislature, but did not suggest that the statute unconstitutionally invaded an area reserved exclusively to this Court. Rather, the clear implication was that the statute remained fully effective except to the extent the Court exercised its constitutional powers to impose different provisions for the disqualification of judges. See also *Stroinski v. Office of Public Defender*, 134 *N.J.Super.* 21, 31 (App.Div. 1975); *State v. United States Steel Corp.*, 19 *N.J.Super.* 274, 294 (Ch.Div.1952), aff'd 12 *N.J.* 38 (1953). *Cf. State v. Bander*, 56 *N.J.* 196 (1970).[7]

■ We conclude therefore that in the full enjoyment of its paramount and exclusive powers over the judicial branch, the

---

[7]The conclusion that certain matters affecting the judiciary may in some contexts be addressed by other branches and be the subject of joint governmental actions is further illustrated by Art. VI, § 6, par. 4, of the New Jersey Constitution, which provides in pertinent part that:

The judges of the superior court shall also be subject to removal from office by the Supreme Court for such causes and in such manner *as shall be provided by law.*" (Emphasis added).

The Legislature has exercised this constitutional authorization by the enactment of *N.J.S.A.* 2A:1B–1 *et seq.* which specifies both cause for removal from office by the Supreme Court and the procedure to be followed. This Court itself has further implemented this statute through its own rulemaking powers. *R.* 2:14.

Supreme Court has the authority, reasonably to be implied under the twin principles of the separation and interdependence of governmental powers, to permit or accommodate the lawful and reasonable exercise of the powers of other branches of government even as that might impinge upon the Court's constitutional concerns in the judicial area. The constitutional validity of such action by another branch of government, and the Supreme Court's ultimate power to accept or reject such action, turn upon the legitimacy of the governmental purpose of that action and the nature and extent of its encroachment upon judicial prerogatives and interests.

These principles apply directly to this case in the resolution of the fundamental issue of whether the Conflicts of Interest Law, as most recently amended to cover full-time members of the Judiciary, as well as the municipal court judges of Atlantic City, impinges upon the Supreme Court's constitutional powers under Art. VI, § 2, par. 3. They call for an analysis of the governmental purposes of the legislative action and its interface with judicial prerogatives.

## IV

There can be no equivocation on the point that the New Jersey Conflicts of Interest Law, as most recently amended, vitally serves a significant governmental purpose. The paramount objective of the Conflicts of Interest Law in general is to "ensure propriety and preserve public confidence" in government, *N.J.S.A.* 52:13D–12(b). Its prohibitions, applicable to a wide spectrum of public officials and employees, include accepting gifts for favors, *N.J.S.A.*, 52:13D–14, outside representation on a matter dealt with in an official capacity, *N.J.S.A.* 52:13D–17, and voting on subjects in which the official has a pecuniary or personal interest, *N.J.S.A.* 52:13D–18.

The current amendment of the Conflicts of Interest Law deals specifically with the casino gambling industry. As a supplement of the Casino Control Act, as well as the Conflicts of Interest

Law, *L.* 1981, *c.* 142 seeks further to sanitize casino gambling and its potentially corrupting effect upon government. Gambling is an activity rife with evil, so prepotent its mischief in terms of the public welfare and morality that it is governed directly by the Constitution itself. *N.J. Const.* (1947), Art IV, § 7, par. 2. As expressed in the Casino Control Act, which implements the Constitution's gambling clause, it is the pronounced policy of this State to regulate and control the casino industry with the utmost strictness to the end that public confidence and trust in the honesty and integrity of the State's regulatory machinery can be sustained. *Ante* at 380–381. This public policy calls for standards controlling the conduct of the State's officials and public employees in dealing with casino entities. The legitimacy of these governmental concerns, reflected in the current New Jersey Conflicts of Interest Law, cannot be doubted and impel the strongest deference and support on the part of the judicial branch of government.

The further question is whether the Legislature's painstaking and far-reaching efforts to impose meaningful and effective restrictions designed to thwart and suppress official misconduct and corruption in terms of the casino gaming industry pose any unbridgeable conflict with the Supreme Court's judicial powers. Resolution of this question calls not for a jealous or begrudging evaluation by the Court of comparative judicial and legislative interests, but a realistic and fraternal appreciation of the profound concern of the Legislature, an equal branch of government, over casino gambling and the enormity of the legislative undertaking to regulate this industry in the public interest.

In many aspects we discern no fundamental schism between the New Jersey Conflicts of Interest Law and judicial interests. Sections 2(e) and (f) of the current amendment deal, respectively, with accepting favors and influence peddling in the casino industry by various persons in public office, including members of the judiciary. Section 2(b) restricts persons, while in office, or those with whom they may be associated, from employment with, representation of, ownership in, or negotiation with any

casino interest. We have no hesitancy in pointing out that such conduct would be unethical under the present Canons of Judicial Ethics. Compare § 2(b) with Canons 5(C)(1) and 5(F), Code of Judicial Conduct; § 2(e) with Canon 5(C)(4), Code of Judicial Conduct, and § 2(f) with Canon 2(B), Code of Judicial Conduct. Assuredly there is no conflict between the statutory law and the Court's disciplinary rules in this respect.

Section 2(c) of the amendatory act prohibits employment by, representation of, negotiation for, or ownership of casino licensees or applicants *after* termination of the person's public employment. This statutory prohibition now applies to full-time members of the judiciary including all full time municipal court judges, as well as the Atlantic City municipal court judges. The Court's disciplinary rules do not presently embrace similar restrictions. See Canon 5(C)(1), Code of Judicial Conduct; R. 1:17.

Nevertheless, the type of judicial conduct prohibited by § 2(c) is, in our view, generally consistent with the purpose, theme and spirit of the ethical strictures upon judicial conduct imposed by the ordinary rules of judicial ethics. It is well settled that the scope of activity of members of the bar and judiciary over which the Supreme Court has regulatory authority is very broad. It has been stated as to an attorney holding a judicial office that "*any* misbehavior, private or professional, which reveals lack of the character and integrity essential for the attorney's franchise constitutes a basis for discipline," In re Mattera, supra, 34 N.J. at 264 (emphasis added). See In re Vasser, 75 N.J. 357 (1978). See also Ante at 386–387.

The fact this Court may have addressed related ethical problems and adopted less stringent prohibitions does not demonstrate any incompatibility between L. 1981, c. 142, and the rules adopted by this Court. In fact, the Conflicts of Interest Law amendment might conceptually be considered as no more than a preventive extension of certain disciplinary rules designed by this Court to prevent the misuse of public office and to eliminate conflicts and avoid the appearance of impropriety in the per-

formance of public responsibilities.[8]　See, e. g., *DR* 8–101 (prohibits the improper use of public office).　See also *In re Opinion No. 415*, 81 *N.J.* 318 (1979); *In re Vasser, supra; Higgins v. Advisory Committee on Professional Ethics*, 73 *N.J.* 123 (1977).

We do not believe that the restrictions imposed by the latest amendments, *L.* 1981, *c.* 142, will in any way interfere with the sound administration of the judicial system or undermine the proper regulation of the ethical conduct of members of the judiciary and the bar.　Any possible doubts on this score dissipate in light of this Court's overriding constitutional authority to adopt and fashion its own regulatory and ethical requirements for the judicial branch and the practicing bar at any time it becomes appropriate to do so regardless of the Legislature's action.

■　Accordingly, we conclude that the New Jersey Conflicts of Interest Law in its prohibitions against full-time members of the judiciary, including all full-time municipal court judges, and Atlantic City municipal court judges, does not presently conflict with the constitutional judicial powers of the Supreme Court. Since that law serves an important, legitimate governmental purpose clearly within the State police powers and deals with a direct and vital concern of the Legislature, and it does so in a

---

[8]Plaintiffs argue that a rule promulgated by this Court, *R.* 1:15–1(c), should preclude this type of legislative enactment.　This claim seems to be that the mere existence of this rule (which circumscribes to some extent the outside activities of municipal court judges) nullifies further regulation of municipal court judges' activities.　There is in our view no intrinsic or fundamental incompatibility between the strictures currently imposed upon magistrates under *R.* 1:15–1(c) and the more extensive restrictions of the New Jersey Conflicts of Interest Law.　Moreover, there is no reason that the limitations of *R.* 1:15–1 should be deemed to be the sole and exclusive limitation upon the practice of law by members of the Judiciary.　The absence of any expression of preemptive intent in the rules adopted by this Court governing the conduct of attorneys and judges, as well as the long-established policy of judicial acceptance of statutory arrangements touching upon this Court's constitutional prerogatives, distinguish the situation here from the one involved in *Wajert v. State Ethics Commission*, 491 *Pa.* 255, 420 *A.2d* 439 (1980) (holding Pennsylvania State Ethics Act unconstitutional as applied to former judges).

fashion that does not interfere with the Supreme Court's administration of the court system and regulation of the judiciary and legal profession, we uphold the constitutionality of the application of these statutory ethical restrictions to such members of the judiciary.

## V

We are constrained to deal with another problem that is now clearly and unavoidably presented by our determination that the ethical standards of the New Jersey Conflicts of Interest Law apply to full-time members of the judiciary, including all full-time municipal court judges and the municipal court judges of the City of Atlantic City. The effect of this legislation, as construed and upheld by the Court today, directly imposes ethical strictures upon some, indeed most, of the judiciary of the State. It would leave unregulated, however, all part-time municipal court judges who preside in municipalities other than Atlantic City. The ethical obligations of this class of the judiciary in relation to the casino gaming industry must be addressed.

It is appreciated that the Legislature in the exercise of its police powers in the sensitive and vulnerable area of legalized casino gambling believed from its perspective that part-time municipal court judges, not presiding in Atlantic City, need not be saddled with the ethical burdens it placed upon all other judges and other public officials. The perspective of the Judiciary, however, cannot be a mirror copy of the legislature's. Our special concern is whether, from the standpoint of judicial administration, one segment of the judiciary should be ethically bound while another remains ethically unfettered. Fairness, uniformity, consistency and public confidence all strongly importune that judicial ethical obligations be shouldered by all judges without distinction.

As already demonstrated the judicial power over judges and the discipline of the bar extends completely to judges of the municipal court. *In re Mattera, supra.* It is appropriate and

desirable therefore that the part-time municipal court judges, who share and exercise the judicial power, also be restricted ethically in their official and professional relations with casino gambling interests. See *In re Vasser, supra; In re Spitalnick,* 63 *N.J.* 429 (1973).

We are satisfied that the constitutional concerns and legislative policy implicated in the Casino Control Act, and the obvious need for stringent and comprehensive regulations over the State's officialdom in relation to casino gambling, call for strict ethical standards to be applicable to all municipal court judges while holding office. The imposition of such standards serves judicial policy as well. It furthers the salutary goal of achieving consistency and uniformity throughout the judiciary, ensuring fairness among judges, enhancing the appearance of judicial probity and fostering public confidence in the administration of justice. See Canons 1 and 2(A), Code of Judicial Conduct; *cf. In re Wilson,* 81 *N.J.* 451 (1979); *In re Opinion No. 415, supra.*

In determining the nature and scope of the ethical restrictions to be fastened upon part-time municipal court judges, outside of the City of Atlantic City, however, recognition should be accorded the fact that their official responsibilities are only part time and that, unlike any other member of the judiciary, municipal court judges are not barred from engaging in the general practice of law. The ethical restrictions imposed upon municipal court judges presently accommodate their part-time status and their right to practice law. *R.* 1:15–1(c). This factor suggests that application of the ethical restrictions relating to the casino gambling industry should also take into account the part-time status of municipal court judges.

Accordingly, we determine, in the exercise of the constitutional judicial power under Art. VI, § 2, par. 3, that part-time municipal court judges, while in office, are subject to the ethical restrictions now provided in the New Jersey Conflicts of Interest Law and that these restrictions shall govern the conduct of such judges in office, both with respect to the discharge of their

officials responsibilities and with respect to their practice of law including any law firm or other attorneys with whom they are employed or associated.

■ We further determine, in the exercise of the constitutional judicial powers, that the post-termination restrictions contained in the current New Jersey Conflicts of Interest Law now made applicable to all full-time judges and municipal court judges of Atlantic City, and to those with whom they may become associated in the practice of law, shall also apply to part-time municipal court judges upon their termination of public office; but that such post-termination restrictions shall be limited to such judges individually and shall not be extended to law firms or other attorneys with whom they become associated after leaving judicial office.

## VI

In our disposition of this appeal we have decided that the ethical restrictions of the New Jersey Conflicts of Interest Law, as amended, *L.* 1981, *c.* 142, apply to the judiciary, including judges of the municipal courts (with some limitations as to those who are part time), and that the law as applicable to all judges is not unconstitutional. The law has been applicable to the judiciary from the effective date of the amendment of *L.* 1980, *c.* 79, since the trial court's decision of unconstitutionality was stayed during the pendency of this appeal.

Nevertheless, we recognize that there has been genuine uncertainty as to the applicability of that law to municipal court judges and, indeed, the passage of *L.* 1981 *c.* 142 on May 14, 1981 while the matter was on appeal before us reducing the extent of judicial coverage, undoubtedly created additional uncertainty as to the applicability of the ethical restrictions to municipal court judges and particularly those who are part time.

We deem it unfair that the ethical restrictions, which we have determined to be applicable to all municipal court judges, both full time and part time, be made operative without affording

these judges a reasonable opportunity to avoid or accept the sanctions of the law. We anticipate that many municipal court judges will choose to remain in office fully subject to the ethical restriction hereby mandated. We also realize that others, depending upon individual circumstances and attitudes, may prefer to resign their judicial offices. A reasonable time for these decisions and adjustments should be afforded.

Our decision therefore as it pertains to all judges of the municipal court, with the exception of those presiding in the City of Atlantic City, shall not be effective for six months. In all other respects, our decision upholding the constitutionality of the New Jersey Conflicts of Interest Law as applied to all other members of the judiciary shall be operative and self-executing.[9]

Accordingly, the judgment below is reversed.

*For reversal* —Chief Justice WILENTZ, and Justices SULLIVAN, PASHMAN, CLIFFORD, SCHREIBER, HANDLER and POLLOCK—7.

*For affirmance* —None.

---

[9]In so ruling we acknowledge that it is appropriate to amend our current ethical rules and administrative directives to conform to the ethical standards hereby made applicable to all judges. This will be undertaken upon the issuance of this decision.