924 A.2d 533

MICHELLE THURBER, APPELLANT–RESPONDENT, v. CITY OF BURLINGTON, RESPONDENT–APPELLANT, AND STATE OF NEW JERSEY JUDICIARY AND THE HONORABLE JOHN A. SWEENEY, A.J.S.C., INTERVENORS–APPELLANTS.

Argued May 1, 2007—Decided June 20, 2007.

488

*Steven W. Suflas* argued the cause for intervenors-appellants (*Ballard Spahr Andrews & Ingersoll*, attorneys; *Mr. Suflas and John P. Mueller*, on the brief).

*Anthony Valenti* argued the cause for appellant (*Cureton Caplan*, attorneys; *Karen M. Murray*, on the letter in lieu of brief).

*Steven P. Weissman* argued the cause for respondent (*Weissman & Mintz*, attorneys).

*Pamela N. Ullman*, Deputy Attorney General, submitted a letter in lieu of brief on behalf of respondent Merit System Board (*Stuart Rabner*, Attorney General of New Jersey, attorney).

Justice HOENS delivered the opinion of the Court.

This appeal presents us with the opportunity to clarify the intersection between discipline of employees holding career service municipal court positions and the authority of Assignment Judges as this Court's constitutional designees for oversight of judiciary employees within the vicinages. Because we conclude that, under the circumstances presented here, this employee's job classification was allocated by the judiciary to the career service for disciplinary purposes, and because we further conclude that the penalty imposed upon the employee by the Merit System Board was not arbitrary, capricious, or unreasonable, we reject the suggestion that the Board's exercise of authority interfered

with the constitutional prerogatives of the Judiciary or the Assignment Judge.

I.

The facts that gave rise to this matter are not in dispute. At the time of the events in question, plaintiff Michelle Thurber had been employed by defendant City of Burlington (City) as a Deputy Municipal Court Administrator for over ten years. Although the particulars are not germane to our consideration of the issues raised on appeal, early in the morning on Saturday, September 16, 2000, plaintiff was stopped by the police in Cherry Hill, taken into custody, and charged with several offenses. The following Monday morning, David Thompson, the City Administrator of Burlington, told plaintiff that he was aware of the incident and commented that her job was not in jeopardy. Approximately a month later, John A. Sweeney, the Assignment Judge of the Burlington Vicinage, wrote a letter about the incident to the Mayor and Council of the City. In his letter, the Assignment Judge advised the Mayor and Council that he was exercising his authority under *Rule* 1:33–4 to remove plaintiff temporarily from her position with the municipal court pending resolution of the charges in Cherry Hill. A few days later, based on a decision made by the Mayor and Council, plaintiff was suspended with pay.

In January 2001, plaintiff entered a plea of guilty to reckless driving, *N.J.S.A.* 39:4–96, and disturbing the peace in violation of a municipal ordinance, which resulted in the suspension of her driver's license and the imposition of a fine, respectively. Three other charges, driving while intoxicated, resisting arrest, and criminal mischief, were dismissed. The City Solicitor then notified the Assignment Judge of the disposition of the matter in Cherry Hill, after which the Assignment Judge ordered plaintiff to show cause why she should not be removed from her position with the municipal court. He thereafter withdrew that order and wrote to the City Solicitor, directing that the Mayor and Council take disciplinary action against plaintiff.

On February 7, 2001, the City issued a Preliminary Notice of Disciplinary Action, charging plaintiff with six acts constituting conduct unbecoming a public employee, *N.J.A.C.* 4A:2–2.3(a)(6), and with "other sufficient cause" for discipline, *N.J.A.C.* 4A:2–2.3(a)(11). All of the specified acts related to the events surrounding plaintiff's arrest and guilty plea. At the same time, the City appointed a hearing officer, who conducted a departmental hearing. After hearing testimony from two police officers who had been involved in plaintiff's arrest and considering an expert report offered on plaintiff's behalf, the hearing officer issued a written report. He found that plaintiff had engaged in conduct unbecoming a public employee and concluded that termination was appropriate.

At the Assignment Judge's urging, the City served plaintiff with a Final Notice of Disciplinary Action terminating her employment effective May 14, 2001. Plaintiff's appeal to the Merit System Board (Board), challenging her termination,[1] was transferred to the Office of Administrative Law for a hearing. *See N.J.S.A.* 52:14B–10(c). The City moved for summary decision, asserting that the Board lacked the authority to review the Assignment Judge's decision to remove plaintiff. That motion was denied, and the matter proceeded to a hearing before an Administrative Law Judge (ALJ).

Two police officers, plaintiff, and plaintiff's expert witness testified about the events surrounding plaintiff's arrest. After hearing and considering the testimony and evidence, the ALJ found that plaintiff's behavior following her arrest was caused by a panic attack. However, the ALJ also found that plaintiff's actions leading up to her arrest constituted conduct unbecoming a public employee for which discipline was warranted. In light of plain-

---

[1] After she filed her appeal, plaintiff was served with a further Preliminary and Final Notice of Disciplinary Action. Although those notices arose from the same events, they were based upon the Assignment Judge's separate directive that plaintiff be terminated. Plaintiff also appealed that Final Notice, which was consolidated with her then-pending appeal before the Board.

tiff's unblemished disciplinary record, the absence of evidence relating to certain of the more serious allegations against her, and considerations relating to progressive discipline, the ALJ concluded that termination was not warranted. Instead, the ALJ recommended that a six-month suspension be imposed. However, the ALJ also concluded that, even though he considered termination to be inappropriate, he was without authority to order plaintiff's reinstatement to her position over the objection of the Assignment Judge.

Plaintiff appealed the ALJ's decision to the Board, arguing both that the six-month suspension was too severe and that she was entitled to be reinstated to her position with the municipal court. In its written decision of May 5, 2005, the Board adopted the ALJ's findings of fact, concluded that the six-month suspension was an appropriate penalty, and also concluded that it had the authority to order that plaintiff be reinstated to her position notwithstanding the objection of the Assignment Judge. The City's application for a stay was denied by the Board and the Appellate Division.

Prior to plaintiff's reinstatement, the Appellate Division granted leave to the Judiciary of the State of New Jersey and the Assignment Judge to intervene in the appeal, *see R.* 4:33–1, and then stayed the enforcement of the Board's directive that plaintiff be permitted to return to her municipal court position. In a published decision, *Thurber v. City of Burlington,* 387 *N.J.Super.* 279, 903 *A.*2d 1079 (App.Div.2006), the Appellate Division affirmed the decision of the Board. We granted the separate petitions for certification filed by the City and the Intervenors, 188 *N.J.* 579, 911 *A.*2d 70 (2006).

II.

The New Jersey Constitution vests this Court with the authority to "make rules governing the administration of all courts in the State and, subject to the law, the practice and procedure in all such courts." *N.J. Const.* art. VI, § 2, ¶ 3. Pursuant to our

constitutional mandate, this Court has promulgated rules providing that "[t]he Chief Justice of the Supreme Court shall be responsible for the administration of all courts in the State" and that "[t]o assist in those duties[,] the Chief Justice shall appoint an Administrative Director of the Courts." *R.* 1:33–1. In addition, in each vicinage the Chief Justice appoints a Superior Court judge, who reports directly to the Chief Justice, to serve as the Assignment Judge. *R.* 1:33–2(b). The responsibilities of an assignment judge are set forth in *Rule* 1:33–4 which provides, in relevant part, as follows:

(a) The Assignment Judge shall be the chief judicial officer within the vicinage and shall have *plenary responsibility for the administration of all courts therein, subject to the direction of the Chief Justice and the rules of the Supreme Court.* The Assignment Judge shall be responsible for the implementation and enforcement of the rules, policies and directives of the Supreme Court, the Chief Justice and the Administrative Director.

(b) The Assignment Judge shall be the authorized representative of the Chief Justice for the efficient and economic management of all courts within the vicinage. The responsibilities of the Assignment Judge also *shall include all such matters affecting* county and *municipal governments,* including but not limited to budgets, *personnel,* and facilities.

. . . .

(e) *Subject to uniform minimum standards and conditions promulgated by the Administrative Director, the Assignment Judge may appoint and discharge judicial support personnel within the vicinage.*

[ (emphasis added).]

Although this *Rule* grants broad powers to the Assignment Judge to ensure the efficient administration of the courts, that authority is limited by its terms so as to be "[s]ubject to uniform minimum standards and conditions promulgated by the Administrative Director," including his or her administrative directives. *R.* 1:33–4(e).

Notwithstanding our broad constitutional authority for administration of all courts and the apparent breadth of the *Rule's* delegation of powers to the Assignment Judge, the history surrounding subsection (e) of *Rule* 1:33–4 and its relationship to judiciary employee positions is instructive. The predecessor rule, originally found at *R.* 1:33–3, granted assignment judges greater

discretion over employees, particularly those who were viewed as working closely with judges. *See* Supreme Court Committee to Review Trial Court Personnel Policies, *Initial Report* 3 (1986) [hereinafter *Committee Report*]. In 1975, the Attorney General issued an opinion letter, explaining that the *Rule* "permitted unlimited appointments to positions that would ordinarily be placed in the classified service" as well as to positions for "unclassified employees ... [who] were ... not subject to Civil Service rules and regulations." *Ibid.* Over time, the use of this appointment power to staff positions within the judiciary grew. *See id.* at 4.

Because of increasing concerns voiced by county governments, which were then responsible for funding courts and their operations, and because of issues raised by Civil Service representatives, a study was undertaken in 1980 to review personnel actions under the predecessor rule. *Ibid.* That study concluded that the rule was being used for a variety of purposes including "quick staffing of new ... programs" which would have been delayed if strict compliance with Civil Service procedures were required. *Ibid.* Nevertheless, in an effort to "reduce reliance upon [appointment through the use of] court orders to accomplish routine personnel actions," in 1981, this Court revised the procedures for staffing unclassified positions. *Ibid.* Subsequently, the *Rule* was amended to include subsection (e), making all new appointments subject to the approval of the Administrative Director. *See R.* 1:33–4(e).

Those revisions yielded little progress. *See Committee Report, supra,* at 4–5. As a result, in 1985, Chief Justice Wilentz created the Supreme Court Committee to Review Trial Court Personnel Policies (Committee). *See id.* at 1. He charged the Committee "to review the use of *R.* 1:33–4(e) appointments and to make appropriate policy recommendations" in a statewide plan. Supreme Court Conference of the Chief Justice and Assignment Judges (CJ/AJ Conference), *Minutes of the Dec. 23, 1986 Meeting* at Agenda Item VI. That Committee "recognize[d] the Judiciary's need to

have greater control and flexibility over certain managerial positions in the court system." *Committee Report, supra,* at 5. As a result, the Committee concluded that the continued ability to use the *Rule* to create and staff unclassified positions was needed. *Ibid.* However, the Committee recommended that "more clearly defined appointment policies and standards [were] necessary" to prevent arbitrary appointment authority and create a "more rational and uniform" job classification structure. *Ibid.* The Committee noted that its recommendations would not "unduly restrict the ability of the vicinages to respond to local needs." *Ibid.*

In its report, the Committee proposed limiting appointments to three categories of judicial personnel:

1. Management and administrative trial court staff accountable for the overall operation and management of the county system . . .;

 . . . .

2. Direct and confidential support employees to the judges . . .; and

 . . . .

3. Positions of a highly technical nature with duties or requirements for which regular selection procedures are not viable.

[*Id.* at 5–6.]

The three categories of personnel would remain as unclassified positions, under the authority of the assignment judges. *See id.* at 5. At the same time, the Committee further recommended that positions falling outside these categories should be phased out through attrition and replaced with career service employees, such that "the vacancies [would be] filled in accordance with Civil Service procedures." *Id.* at 6.

In April 1987, the CJ/AJ Conference met to discuss the Committee's report and a proposed directive that would implement the Committee's recommendations. *Minutes of the April 29, 1987 Meeting* at 5. Although certain assignment judges expressed the view that they should be given greater control over judicial personnel, in light of the fact that the counties remained obligated to provide funding, the continued use of career service titles was deemed to be advisable. *Ibid.* At the same time, the Administrative Director reasoned that, were the court system to be unified

and funded by the State, the judiciary could consider creating an internal job classification system independent of the Civil Service system. *Ibid.*

On October 28, 1987, the Administrative Director issued Directive # 8–87 (Directive), which substantially adopted the recommendations of the Committee. *See* Admin. Office of the Courts, Directive # 8–87, *Rule 1:33–4(e) Appointments* (1987). Specifically, the Directive stated:

> As provided in *R.* 1:33–4(e), this directive establishes minimum standards and conditions for the appointment power of unclassified trial court positions. The main purpose of this directive is to clarify recruitment and selection policies for the unclassified judicial service. It is designed to foster fair and effective personnel administration in the unclassified service, to promote career growth, and to improve the Judiciary's ability to manage the support units within the trial court system.
>
> [*Id.* at 1.]

The Directive described the three categories that would continue to be allocated to unclassified service and described how lists of titles allocated to the unclassified service would be promulgated. In addition, the Directive noted that, to provide vicinages with flexibility to meet "interim needs or exceptional circumstances," an assignment judge, upon request to the Chief Justice and with the approval of the Administrative Director, could "certify additional titles for inclusion in the *R.* 1:33 service." *Ibid.*

Following the issuance of the Directive, the Department of Personnel (DOP) wrote to the Administrative Director in February 1990 concerning the allocation of certain of the judiciary job titles to unclassified rather than classified career service positions. The Administrative Director, replying in a March 1990 letter, reiterated the authority of the Court to allocate titles to unclassified service. At the same time, the Administrative Director recognized the value of DOP's technical expertise in making these allocations.

In 1992, the voters in this State adopted an amendment to our Constitution which effected a statewide unification of the courts, together with State takeover of funding for the Superior Court.

*See N.J. Const.* art. VI, § 8, ¶ 1. Thereafter, the Legislature enacted an implementing statute, the Judicial Employees Unification Act, *N.J.S.A.* 2B:11–1 to –12, which sought, in part, to create a unified system relating to judiciary employees in place of the different systems previously used in each county. *See N.J.S.A.* 2B:11–2. Notably, that statute preserves the judiciary's unquestioned right to create unclassified positions within the judiciary and to appoint individuals to fill those positions pursuant to *Rule* 1:33–4. *See N.J.S.A.* 2B:11–5a. Other positions within the judiciary, however, were then, and continue today to be, filled pursuant to Civil Service guidelines. *Ibid.*

As a part of the process of statewide unification of the courts, the DOP was called upon to develop new job specifications for several career service titles within the judiciary. *See The Classification and Compensation System for a Unified Judiciary* (1998). All of the titles were ones that the judiciary had previously allocated to the career service, and the judiciary, through the Administrative Director, actively participated in the process of creating the job specifications needed to unify career service judiciary personnel.

As this historical analysis makes plain, this Court has never relinquished its constitutional authority as it relates to judiciary employees. Rather, we have consistently exercised our right to allocate judiciary positions either to career service or to judiciary unclassified service. As such, DOP's inclusion of particular positions among the local government career service titles is consistent with our decision that those titles would be properly placed in career service. By extension, then, our decision also means that employees occupying those titles would enjoy the same statutory rights and privileges as non-judicial career service employees under the Civil Service Act. *See N.J.S.A.* 11A:2–1 to –24.

### III.

Our constitutional authority over judiciary personnel is unquestioned. *See, e.g., In re P.L.2001, Chapter 362,* 186 *N.J.* 368, 381–

82, 895 *A*.2d 1128 (2006) (constitution gives Court exclusive authority over State judiciary); *In re Judges of Passaic County,* 100 *N.J.* 352, 367, 495 *A*.2d 848 (1985) (per curiam) (recognizing Court's constitutional responsibility for effective functioning of judiciary); *Knight v. City of Margate,* 86 *N.J.* 374, 389–91, 431 *A*.2d 833 (1981) (concluding that Court may "permit or accommodate" use of legislative power on judiciary if Court has not exercised its own constitutional power, legislation serves a legitimate purpose, and Legislature "does not interfere with judicial prerogatives").

 We have previously noted that this Court, through our constitution, has "plenary responsibility for the administration of all courts in the State." *State v. De Stasio,* 49 *N.J.* 247, 253, 229 *A*.2d 636, *cert. denied,* 389 *U.S.* 830, 88 *S.Ct.* 96, 19 *L.Ed.*2d 89 (1967). "[T]his Court is charged with responsibility for the overall performance of the judicial branch. Responsibility for a result implies power reasonably necessary to achieve it." *In re Mattera,* 34 *N.J.* 259, 272, 168 *A*.2d 38 (1961). In addition, we have "the concomitant responsibility to see that the public interest is fully served by the proper functioning of this vital branch of our government." *Passaic County Prob. Officers' Ass'n v. Passaic County,* 73 *N.J.* 247, 253, 374 *A*.2d 449 (1977).

 All parties to this dispute agree that the position in which plaintiff served, Deputy Municipal Court Administrator, is a career service position. Arguably, a Deputy Municipal Court Administrator plays an important role in our court system that would support a greater exercise of this Court's supervisory power. However, the allocation of that title to the career service carries with it our recognition that this employee is also subject to the authority of the Board.

In analogous circumstances, we noted:

> The conclusion is quite inescapable that the constitutional mandate given this Court to "make rules governing the administration of all courts in the State" transcends the power of the Legislature to enact statutes governing those public employees properly considered an integral part of the court system. It has,

however, since 1948, been the practice of this Court, with only occasional deviation, to accept and adopt legislative arrangements that have not in any way interfered with this Court's constitutional obligation discussed above. We have every intention of continuing this practice; to do otherwise would be pointless and self-defeating. *Only where we are satisfied that the proper exercise of our constitutional responsibility to superintend the administration of the judicial system requires such action would we feel compelled to exert this power in the adoption of a rule at odds with a legislative enactment.* We repeat that in the absence of any action by this Court—felt to be constitutionally compelled—and *as a matter of comity and respect for other branches of government,* we accept and adopt all statutory arrangements touching or concerning the administration of any courts in the State, as well as such legislative enactments as have to do with public employees whose duties are intimately related to the judicial system.

[*Id.* at 255, 374 *A.*2d 449 (emphasis added).]

■ We do not share the concern of the Intervenors that the Board's decision about this employee's discipline violates the separation-of-powers provision of the New Jersey Constitution, *N.J. Const.,* art. III, ¶ 1. As we have explained: "The constitutional doctrine of the separation of powers denotes not only independence but also interdependence among the branches of government. Indeed, the division of governmental powers implants a symbiotic relationship between the separate governmental parts so that the governmental organism will not only survive but will flourish." *Knight, supra,* 86 *N.J.* at 388, 431 *A.*2d 833. This Court has further noted:

*"The compartmentalization of governmental powers* among the executive, legislative and judicial branches *has never been watertight."* Inevitably some osmosis occurs when the branches of government touch one another; the powers of one branch sometimes take on the hue and characteristics of the powers of the others. It occasionally happens that an underlying matter defies exact placement or neat categorization; it may not always be possible to identify a subject as belonging exclusively to a particular branch. In those situations responsibility is joint and governmental powers must be shared and exercised by the branches on a *complementary basis* if the ultimate governmental objective is to be achieved.

[*Id.* at 388–89, 431 *A.*2d 833 (emphasis added) (citations omitted) (quoting *In re Salaries for Prob. Officers of Bergen County,* 58 *N.J.* 422, 425, 278 *A.*2d 417 (1971)).]

■ Here, the Board's exercise of authority respecting discipline of this career service employee does not impermissibly infringe upon our authority to make rules governing the court system because we have previously designated plaintiff's position

as one allocated to the career service. *Rule* 1:33–4(e) does not give assignment judges plenary authority over career service employees. Rather, the *Rule* grants authority to assignment judges over unclassified employees and reserves to the Chief Justice the authority to designate which employees are unclassified and which, like the Deputy Municipal Court Administrator, fall within the classified civil service. As such, we agree with the Appellate Division's observation that

> the shared interests of the judiciary and the [Board] in both protecting employees from arbitrary removal and in securing the staffing and management of municipal court personnel that serves, and does not prejudice, the administration of justice—coupled with the Board's considerable expertise in personnel matters—warrants our determination that the Board's jurisdiction over the dispute must take precedence.
>
> [*Thurber, supra,* 387 *N.J.Super.* at 299–300, 903 *A.*2d 1079.]

## IV.

Having concluded that plaintiff was serving in a career service position and entitled to the protection of the Civil Service Act, we next consider whether the Board's decision can be sustained.

The scope of our review of a final agency decision is limited, *see Aqua Beach Condo. Ass'n v. Dep't of Cmty. Affairs,* 186 *N.J.* 5, 15–16, 890 *A.*2d 922 (2006), and we do not ordinarily overturn such a decision "in the absence of a showing that it was arbitrary, capricious or unreasonable, or that it lacked fair support in the evidence," *Campbell v. Dep't of Civil Serv.,* 39 *N.J.* 556, 562, 189 *A.*2d 712 (1963). As we have consistently stated, our role, in general, is limited to determining:

> (1) whether the agency's action violates express or implied legislative policies, that is, did the agency follow the law; (2) whether the record contains substantial evidence to support the findings on which the agency based its action; and (3) whether in applying the legislative policies to the facts, the agency clearly erred in reaching a conclusion that could not reasonably have been made on a showing of the relevant factors.
>
> [*Mazza v. Bd. of Trs.,* 143 *N.J.* 22, 25, 667 *A.*2d 1052 (1995) (citing *Campbell, supra,* 39 *N.J.* at 562, 189 *A.*2d 712).]

In reviewing agency actions, "[a]ppellate courts must defer to an agency's expertise and superior knowledge of a particular field." *Greenwood v. State Police Training Ctr.*, 127 *N.J.* 500, 513, 606 *A.*2d 336 (1992). Although an appellate court is "in no way bound by the agency's interpretation of a statute or its determination of a strictly legal issue," *Mayflower Sec. Co. v. Bureau of Sec.*, 64 *N.J.* 85, 93, 312 *A.*2d 497 (1973), if substantial evidence supports the agency's decision, "a court may not substitute its own judgment for the agency's even though the court might have reached a different result," *Greenwood, supra,* 127 *N.J.* at 513, 606 *A.*2d 336.

Applying these principles to the facts in this record, we find nothing arbitrary, capricious, or unreasonable in the Board's findings and conclusions. The record amply supports the factual findings concerning the circumstances of plaintiff's arrest and the Board's conclusion that her behavior warranted the imposition of a significant disciplinary sanction. In light of plaintiff's unblemished record and long period of service, however, there is nothing arbitrary or capricious in the Board's decision that a penalty short of termination would be appropriate.

## V.

The judgment of the Appellate Division is affirmed.

*For affirmance*—Chief Justice ZAZZALI and Justices LONG, LaVECCHIA, ALBIN, WALLACE and HOENS—6.

*Opposed*—None.