In re **ELSINORE SHORE ASSOCIATES,** f/k/a **Playboy Elsinore Associates, a New Jersey partnership, d/b/a the Atlantis Casino Hotel, Debtor.**

**ELSINORE SHORE ASSOCIATES, f/k/a Playboy Elsinore Associates, a New Jersey partnership, d/b/a the Atlantis Casino Hotel, by the Unsecured Creditors Committee, Plaintiff,**

v.

**CASINO CONTROL COMMISSION OF the STATE OF NEW JERSEY, Defendant.**

Bankruptcy No. 85–06058.
Adv. No. 86–0090.

United States Bankruptcy Court, D. New Jersey.

Aug. 29, 1986.

See also, Bkrtcy., 66 B.R. 708.

Crummy, Del Deo, Dolan, Griffinger & Vecchione by Michael R. Griffinger, Newark, N.J., for Elsinore Shore Associates.

McCarter & English by Joseph E. Irenas, Newark, N.J., for Playboy Enterprises, Inc.

Kirkland & Ellis by Donald G. Kempf, Jr., Sydney Bosworth McDole, Chicago, Ill., for Playboy Enterprises, Inc.

**726**

Valore, McAllister, Westmoreland, Gould Vesper & Schwartz by Alan I. Gould, Eric A. Browndorf, Northfield, N.J., for Unsecured Creditors' Committee.

James C. Fogarty, Deputy Atty. Gen., State of N.J., Dept. of Law and Public Safety, Div. of Gaming Enforcement.

Leonard J. Di Giacomo, Asst. Counsel, State of N.J., Casino Control Com'n.

## OPINION

ROSEMARY GAMBARDELLA, Bankruptcy Judge.

There are presently two matters before the Court. The first matter is a motion, filed by Elsinore Shore Associates, f/k/a Playboy Elsinore Associates, a New Jersey partnership, d/b/a The Atlantis Casino Hotel, (ESA), the debtor-in-possession herein. ESA is seeking an order authorizing ESA to pay prepetition license fees and taxes due to the New Jersey Casino Control Commission (Commission), pursuant to an April 14, 1986 decision of the Commission. By that April 14, 1986 decision, the Commission made ESA's payment of prepetition license fees and taxes a prerequisite to the Commission's renewal of ESA's casino license.

The second matter presently before the Court was commenced by the filing, on May 9, 1986, of a Verified Complaint, Adversary No. 86–0090. The Verified Complaint was filed against the Commission by the Unsecured Creditors' Committee of the debtor. The adversary proceeding was commenced pursuant to 11 U.S.C. §§ 105, 362 and 525 in the name of the debtor, for the benefit of the debtor, its estate and all unsecured creditors. The relief sought by the adversary complaint is: (1) a declaration that the enforcement by the Commission of the license condition, requiring ESA to pay prepetition license fees and taxes, constitutes discriminatory treatment under 11 U.S.C. § 525; (2) a declaration that the payment by ESA of the prepetition fees and taxes is subject to the automatic stay provisions of 11 U.S.C. § 362(a), and; (3) an order preliminarily and permanently enjoining the Commission, pursuant to 11 U.S.C. § 105(a), from enforcing the license condition which requires the payment by ESA of prepetition fees and taxes. Since there is presently no immediate threat to the debtor's casino license, the parties before the court agree that the preliminary injunction sought by the Creditors' Committee is no longer at issue, thus the court will address the request for a permanent injunction.

On May 14, 1986, ESA moved before the Commission for deferral of the first installment payment of the subject fees and taxes, which installment was due May 15, 1986. The Commission which sat on May 14, 1986 was comprised of three members, however, five members are required to constitute a quorum. Since a quorum was lacking, the Commission decided not to take any action regarding ESA's casino license until May 29, 1986, when the commission would again convene.

The facts leading up to the instant motion and adversary complaint are as follows. On November 14, 1985, ESA filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Since that time, ESA, as a debtor-in-possession, has continued the operation of its business, the Atlantis Casino Hotel, located in Atlantic City, New Jersey. Pursuant to the New Jersey Casino Control Act (Act), N.J.Stat. Ann. § 5:12–1 through –183, ESA presently holds a valid casino license issued by the Commission.

By an Amended Final Order dated May 6, 1982, the Commission granted a casino license which became effective on April 13, 1982, to Playboy-Elsinore Associates, the predecessor to ESA. That license has been renewed annually since its issuance. Pursuant to N.J.Stat.Ann. § 5:12–88, casino licenses are issued for a term of one year and may be renewed annually. ESA's casino license was renewed on March 27, 1985. The renewal period was from April 14, 1985 and was to expire on April 14, 1986. On January 15, 1986, ESA applied to the Commission for renewal of its casino license. On April 14, 1986 the Commission renewed ESA's casino license, but conditioned the

renewal upon several factors, including ESA's payment of $993,709.99 to the Casino Control Fund on account of license fees and $146,411.00 to the Casino Revenue Fund on account of taxes. Pursuant to the Act, the Commission is responsible for collecting all license and registration fees and taxes imposed by the Act and by the regulations promulgated thereunder. N.J.Stat. Ann. § 5:12–63(d). The Commission prescribed a three-installment payment schedule for ESA pursuant to which payments were due on May 15, June 16, and June 30, 1986.

The Division of Gaming Enforcement of the State of New Jersey, Department of Law and Public Safety (Division) has also been involved in ESA's license renewal application in accordance with its duty, under the Act, to investigate all casino license applications and provide the Commission with all necessary information relating thereto. Accordingly, the Division is a party-in-interest herein.

Prior to the filing of the instant motion, on March 27, 1986, ESA filed a motion with this court seeking an order authorizing the debtor to pay the subject prepetition license fees and taxes to the Commission. As of November 13, 1985, ESA owed $993,709.99 to the Casino Control Fund for license fees and $146,411.00 to the Casino Revenue Fund for taxes.[1]

1. By letter dated February 27, 1986, the Commission, through its Division of Financial Evaluation and Control, notified ESA that certain fees and taxes were due by ESA to the Commission for the period ending November 13, 1985 as follows:

CASINO CONTROL FUND:

| CATEGORY | INV. # | DATE | AMOUNT | DATE COSTS INCURRED |
|---|---|---|---|---|
| Casino License | | | | |
| Fees | 8473 | 12/02/85 | $ 51,129.00 | July 1985 |
| (N.J.S.A. | 8531 | 12/04/85 | 40,658.78 | August 1985 |
| 5:12–139) | 8575 | 12/13/85 | 36,036.14 | Sept. 1985 |
| | 8656 | 01/10/86 | 43,894.00 | October 1985 |
| | 8741 | 01/24/86 | 23,452.69 | Costs through Nov. 13, 1985 |
| Total Casino License Fees as at November 13, 1985 | | | $195,170.61 | |
| Enforcement, Compliance & Contract | | | | |
| Review | 8464 | 12/02/85 | $ 55,236.19 | July 1985 |
| | 8530 | 12/04/85 | 44,411.24 | August 1985 |
| | 8564 | 12/13/85 | 52,910.55 | Sept. 1985 |
| | 8645 | 01/10/86 | 47,543.62 | October 1985 |
| | 8739 | 01/24/86 | 30,872.92 | Costs through Nov. 13, 1985 |
| Total Enforcement, Compliance and Contract Review as at November 13, 1985 | | | $230,974.52 | |
| Inspection | | | | |
| Fees | 8455 | 12/02/85 | $140,160.00 | July 1985 |
| | 8529 | 12/04/85 | 118,960.00 | August 1985 |
| | 8553 | 12/13/85 | 113,820.00 | Sept. 1985 |
| | 8634 | 01/10/86 | 113,380.00 | October 1985 |
| | 8737 | 01/24/86 | 77,460.00 | Costs through Nov. 13, 1985 |
| Total Inspection Fees as at November 13, 1985 | | | $563,780.00 | |
| Slot Machine | | | | |
| Fees | 8590 | 01/06/86 | | Nov. 1, through |
| (N.J.S.A. 5:12–140) | | | $ 208.33 | Nov. 13, 1985 |

In its March 27, 1986 motion, ESA asserted that the license fees and taxes at issue constitute prepetition claims against the debtor which may not be paid without an order from this court authorizing such payment. ESA contended that the subject fees and taxes may be entitled to priority in payment pursuant to 11 U.S.C. § 507(a)(7) or 11 U.S.C. § 503(b). Title 11 U.S.C. § 507(a)(7) specifies certain taxes as having priority in payment. Title 11 U.S.C. § 503(b)(1)(A) allows as an administrative expense, "the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commission for services rendered after the commencement of the case." In briefs and oral argument presented to this court in connection with ESA's March 27, 1986 application for permission to pay the subject license fees and taxes, ESA claimed that its casino license is its most important asset, and that the continuance of the license is the "sine qua non" of ESA's proposal of a plan of reorganization.

The Creditors' Committee objected to the payment of the prepetition licensing fees and taxes on the following grounds: (1) the subject fees and taxes are prepetition debts which may not be paid under the bankruptcy code; (2) 11 U.S.C. § 362 operates to stay the payment of these fees and taxes, and; (3) the Commission's refusal to renew ESA's casino license based upon ESA's non-payment of these prepetition debts, constitutes discriminatory treatment under 11 U.S.C. § 525, and violates the Supremacy Clause of the United States Constitution. The Creditors' Committee further contended that the payment of these fees and taxes by ESA would be detrimental to all of ESA's creditors because it would

| CATEGORY | AMOUNT | DATE COSTS INCURRED |
|---|---|---|
| Total Slot Machine Fees as at November 13, 1985 | $ 208.33 | |
| Work Permit Fees (N.J.S.A. 5:12–142) | $ 3,046.00 | June 1985 through Nov. 13, 1985 |
| Total Work Permit Fees as at November 13, 1985 | $ 3,046.00 | |
| Miscellaneous | $ 530.30 | Certified Shorthand Reporting Charges |
| Total Miscellaneous at November 13, 1985 | $ 530.30 | |
| Total of outstanding accounts receivable due the Casino Control Fund as at 11/13/85 | $993,709.99 | |

CASINO REVENUE FUND:

| CATEGORY | AMOUNT | DATE COSTS INCURRED |
|---|---|---|
| Gross Revenue Taxes (N.J.S.A. 5:12–144) | $ 78,666.00 | Nov. 9 through Nov. 10, 1985 |
| | $ 67,745.00 | Nov. 11 through Nov. 13, 1985 |
| Total Gross Revenue Taxes as at November 13, 1985 | $146,411.00 | |
| Total of outstanding accounts receivable due the Casino Revenue Fund as at November 13, 1985 | $146,411.00 | |

adversely impact upon ESA's cash flow and upon ESA's ability to file a workable plan of reorganization.

The Division, in a letter memorandum dated April 2, 1986, argued that the automatic stay provisions of 11 U.S.C. § 362(a) do not bar payment by the debtor of claims asserted against it, unless the claims arose prior to the voluntary petition. The Division further argued that the fees which ESA is seeking to pay are the subject of invoices filed with ESA from and after December 2, 1985. The Division concluded that the automatic stay does not bar the payment of the fees at issue because the claim did not arise prior to November 14, 1985, the date the voluntary bankruptcy petition was filed. Accordingly, the Division argued that proceedings regarding the subject fees could not have been commenced against the debtor before November 14, 1985, since the fees were not calculated until after the petition was filed. Similarly, with respect to the gross revenue tax, the Division noted that the tax is not due and payable until March 15, 1986 pursuant to N.J.Stat.Ann. § 5:12–148 and N.J. Admin.Code tit. 19, § 54–15. Accordingly, the Division concluded that 11 U.S.C. § 362 does not operate to stay the payment of the taxes. The Division further argued that even if the subject fees and taxes are encompassed by 11 U.S.C. § 362, payment of those fees would be permissible by virtue of the exception to the automatic stay contained in § 362(b)(4).

Playboy Enterprises, Inc. (PEI), the largest unsecured creditor of ESA, and a member of the Creditors' Committee, also objected to ESA's application. PEI supported the position asserted by the Creditors' Committee, and further argued that the exceptions to the automatic stay contained in 11 U.S.C. § 362(b)(4) and (5) are not applicable in the instant matter. Title 11 U.S.C. § 362(b)(4) and (5) excepts from the operation of the automatic stay, proceedings by governmental units to enforce the police and/or regulatory powers of such governmental units. PEI argued that, although state police powers may be exercised against a debtor in order to reason-ably protect the public health, safety and welfare by preventing or causing the doing of an act, they may not be exercised to extract monies from a debtor.

The Commission did not enter its appearance in connection with ESA's March 27, 1986 application for authority to pay the subject prepetition license fees and costs.

On April 11, 1986 this court denied, without prejudice, ESA's March 27, 1986 application for authorization to pay prepetition license fees and taxes. This court held that such payment would violate the automatic stay provisions of 11 U.S.C. § 362, and the scheme of priorities established by the Bankruptcy Code for the payment of prepetition debts. On May 6, 1986, ESA filed the instant motion seeking authorization to pay the subject license fees and taxes. Since the April 11, 1986 decision was rendered, the only change in the relevant circumstances was the Commission's decision of April 14, 1986. As aforesaid, on April 14, 1986, the Commission conditioned ESA's relicensure in part upon the payment, in three installments, of the subject license fees and taxes. The Division has reiterated its position herein and supports ESA's application for payment of the license fees and taxes.

The Commission argues, in connection with the present motion and adversary complaint, that: (1) the Creditors' Committee is not entitled to preliminarily enjoin the Commission since the Creditors' Committee has not demonstrated that ESA will suffer immediate and irreparable harm if the injunction is not issued; (2) the administrative proceedings conducted by the Commission which resulted in the imposition of the condition regarding fees and taxes being imposed, are not proceedings "against" ESA, furthermore, the renewal hearing before the Commission is not a proceeding to recover a "claim" against ESA, therefore the proceeding and renewal hearing conducted by the Commission are not subject to the automatic stay provision of 11 U.S.C. § 362; (3) if the automatic stay is applicable, 11 U.S.C. § 362(b)(4) excepts the pro-

ceedings at issue from the automatic stay because the proceedings are in furtherance of the Commission's enforcement of its police and regulatory powers; (4) 11 U.S.C. § 525 is not designed to confer a benefit upon a debtor so that the debtor enjoys preferential treatment to which it would not otherwise be entitled, and; (5) the outstanding fees and taxes owed by ESA are statutorily required renewal application charges which are a precondition to license renewal and are "the actual, necessary costs and expenses of preserving the estate" under 11 U.S.C. § 503(b)(1)(A). The Commission also argues that, although the fees at issue are based upon costs incurred before a license is issued, these fees relate to the issuance of the renewed license, not to the expired license. *See*, N.J.Stat.Ann. § 5:12–88 and N.J.Admin.Code § 19:41–9.-4(a)(5).

In support of the instant motion, ESA reiterates its position that payment of the subject fees is allowable under 11 U.S.C. § 503(b) as an actual and necessary cost and expense of preserving the estate.

For the reasons set forth in the opinion to follow, the Court denies the present application of ESA for authority to pay prepetition license fees and taxes as such payment would violate the automatic stay provision of 11 U.S.C. § 362. The Court further finds that the Commission's action requiring ESA to pay prepetition license fees and taxes as a condition of relicensure violates 11 U.S.C. § 525 of the Bankruptcy Code. Accordingly, the subject license fees and taxes may not be paid, and the Commission is enjoined from requiring ESA to pay the outstanding fees and taxes as a precondition of the renewal of its casino license.

N.J.Stat.Ann. § 5:12–88, entitled "Renewal of Casino Licenses" provides, in relevant part:

a. Subject to the power of the commission to deny, revoke, or suspend licenses, any casino license in force shall be renewed by the commission for the next succeeding license period upon proper application for renewal and payment of license fees and taxes as required by law and the regulations of the commission. The commission shall act upon any such application no later than 30 days prior to the date of expiration of the current license.

b. Application for renewal shall be filed with the commission no later than 90 days prior to the expiration of the current license, and all license fees and taxes as required by law shall be paid to the commission on or before the date of expiration of the current license.

N.J.Admin.Code tit. 19 § 41–9.4 provides in relevant part:

(b) No application for the issuance or renewal of a casino license shall be accepted for filing by the Chairman unless a nonrefundable deposit of $100,000 shall first have been paid in full; provided that, where an unlicensed applicant for a casino license has paid the said deposit and subsequently requests a temporary casino permit in accordance with Section 95.1, the deposit previously paid shall be considered as the deposit for the temporary casino permit application. Such deposit shall be applied to the initial license fee or renewal fee if the application is approved.

(c) No casino license shall be issued unless the applicant shall first have paid in full an issuance fee of not less than $200,000.

(d) No casino license shall be renewed unless the applicant shall first have paid in full a renewal fee of not less than $100,000 for each renewal.

(e) As a component of its initial license fee or renewal fee and as a condition of casino licensure, each applicant or licensee shall be required:

1. To pay at the rate of $40.00 per hour for efforts of professional staff members of the Commission and the Division on matters directly related to the applicant or licensee; and

2. To reimburse any unusual costs or out of pocket expenses incurred by the Commission or the Division in regard to such matters.

Article 11 of the Act, N.J.Stat.Ann. § 5:12–139 through –152, entitled "Fees and Taxes," itemizes the fees and taxes imposed by the Act. The following is a noninclusive list of the fees established by the Act: an annual casino license renewal fee which is based upon the cost of maintaining control and performing the regulatory activities contemplated by the Act, as established by N.J.Stat.Ann. § 5:12–139; an annual slot machine license fee, pursuant to N.J.Stat.Ann. § 5:12–140; an issuance and renewal fee for licenses and registrations other than casino licenses, as established by N.J.Stat.Ann. § 5:12–141, and; an annual work permit fee, pursuant to N.J.Stat.Ann. § 5:12–142. These fees must be paid by check or money order made payable to the "Casino Control Fund" (CCF) and presented to the Commission at its offices, for deposit in the CCF. N.J.Admin.Code tit. 19, § 41–9.3(c). These fees are to be appropriated exclusively for the operating expenses of the Commission and the Division. N.J.Stat.Ann. § 5:12–143.

Under the Act, an 8% annual tax, called a gross win tax, has been imposed upon the gross revenues of casino licensees. N.J. Stat.Ann. § 5:12–144. The gross win tax is payable annually on or before the 15th calendar day of March of the following year. N.J.Stat.Ann. § 5:12–148(a). However, the Commission is required to cause casino licensees to make at least monthly tax deposits at such times and in such depositories as prescribed by the State Treasurer. N.J.Stat.Ann. § 5:12–145(b). These monies, deposited in the Casino Revenue Fund (CRF), are appropriated exclusively for reductions in property taxes, rentals, telephone, gas, electric, and municipal utilities charges incurred by eligible senior citizens and disabled residents of the State and for such additional or expanded services and benefits as authorized by law pursuant to N.J.Stat.Ann. § 5:12–145.

Under 11 U.S.C. § 362, the filing of a bankruptcy petition operates as a stay with regard to almost all actions against a debtor including:

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the debtor that was or could have been commenced before the commencement of the case under this title, or to recover a claim against the debtor that arose before the commencement of the case under this title;

(2) the enforcement, against the debtor or against property of the estate, of a judgment obtained before the commencement of the case under this title;

(3) any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate;

(4) any act to create, perfect, or enforce any lien against property of the estate;

(5) any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case under this title;

(6) any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title;

(7) the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor; and

(8) the commencement or continuation of a proceeding before the United States Tax Court concerning the debtor.

11 U.S.C. § 362(a).

■ The scope of the automatic stay provision of 11 U.S.C. § 362 is broad and encompasses all proceedings, even those not before governmental tribunals. H.R. No. 595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 6297. Title 11 U.S.C. § 362 freezes the rights of creditors as of the date of the filing of a petition under the Bankruptcy Code in order to protect against the piecemeal distribution of the bankruptcy estate. The automatic stay also operates to ensure that claims against a debtor's estate are

resolved in an orderly fashion in accordance with the priorities scheme of the Bankruptcy Code, and to prevent a " 'chaotic and uncontrolled scramble for the debtor's assets in a variety of uncoordinated proceedings in different courts.' " *In re Holtkamp*, 669 F.2d 505, 508 (7th Cir.1982) (quoting *In re Frigitemp Corp.*, 8 B.R. 284, 289 (S.D.N.Y.1981)).

■ The Third Circuit Court of Appeals in the case of *Matter of M. Frenville Co., Inc.*, 744 F.2d 332 (3d Cir.1984), *cert. denied*, 469 U.S. 1160, 105 S.Ct. 911, 83 L.Ed.2d 925 (1985), set forth the limits of the 11 U.S.C. § 362 automatic stay. The court noted that 11 U.S.C. § 362(a)(1) operates as a stay against a proceeding which "was or could have been commenced" before the filing of the bankruptcy petition, or which is based upon a claim that arose prepetition. 744 F.2d at 334–335. Based upon this language, which reiterates the language of the statute, this court rejects the Division's argument that the claims at issue do not fall within the parameters of 11 U.S.C. § 362. Pursuant to the Division's own accounting, as contained in its April 2, 1986 letter memorandum, the enumerated license fees were incurred on a monthly basis beginning in July, 1985. Accordingly, collection of these fees by the Commission would constitute the collection of prepetition claims, notwithstanding the fact that the fees were calculated, and demand for payment was made, after the filing of the petition.

The word "claim" is broadly defined by the Bankruptcy Code as follows:

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C. § 101(4). Clearly, the unpaid fees at issue are claims under 11 U.S.C. § 101(4)(A).

■ The Division's argument that the gross revenue tax at issue is not encompassed by 11 U.S.C. § 362 is equally without merit. A casino operator is obligated to make weekly deposits of the estimated gross revenue tax. N.J.Admin.Code tit. 19, § 54–1.5(b). The failure to deposit such monies subjects the casino operator to various penalties or sanctions. N.J.Admin. Code tit. 19, § 54–1.10. The fact that N.J. Stat.Ann. § 5:12–148 does not require the filing of a tax return until March 15th of the following year does not render the Commission's claim to these taxes to be post-petition. Instead, these taxes constitute unliquidated claims as of the date of the filing of the petition. Unliquidated claims are cognizable within 11 U.S.C. § 101(4), and are subject to the automatic stay.

The Commission argues that the administrative proceeding conducted by the Commission, which resulted in the imposition of the subject license condition, does not fall within the scope of the automatic stay provisions of 11 U.S.C. § 362(a)(1). In support of this contention, the Commission claims that ESA initiated the proceedings which resulted in the imposition of the conditions upon its relicensure by applying for a renewal of its license. Accordingly, the Commission concludes that the proceeding was not *against* ESA, but rather, *by* ESA. The Commission further contends that the renewal hearing before the Commission was not a proceeding to recover a claim against ESA. At the May 13, 1986 hearing before this court, counsel for the Commission posited that if ESA had not applied for the renewal of its license, the taxes and fees at issue would have been ordinary, nonprioritized claims which could not be collected under 11 U.S.C. § 362. However, the Commission concluded that, because ESA applied for the renewal of its license, the payment of the license fees and taxes became required under 11 U.S.C. § 503(b).

Title 11 U.S.C. § 503(b) provides in relevant part:

(b) After notice and a hearing, there shall be allowed administrative expenses, other than claims allowed under § 502(f) of this title, including—

(1)(A) the actual, necessary costs and expenses of preserving the estate, including wages, salaries, or commissions for services rendered after the commencement of the case.

 This court rejects the Commission's arguments. The fact that ESA initiated the proceedings which resulted in the imposition of the condition on the license has no bearing upon the applicability of 11 U.S.C. § 362. Although 11 U.S.C. § 362(a)(1) operates to stay an "action or proceeding against the debtor," it does not exclude from the automatic stay, actions such as those presently at issue. The scope of the automatic stay provision of 11 U.S.C. § 362 is broad and also includes acts to obtain possession of property of the estate or of property from the estate, and acts to collect, assess or recover a claim against the debtor that arose before the commencement of the bankruptcy case. 11 U.S.C. § 362(a)(3), (6). To find otherwise would be to place form over substance and to overemphasize the syntax of 11 U.S.C. § 362(a)(1). The Commission's second argument, that the license renewal hearing was not a proceeding to recover a "claim" against ESA is equally without merit. Regardless of whether the proceeding is labeled a license renewal proceeding or a proceeding to recover a claim, the effect of the proceeding is to compel the debtor to pay prepetition fees and taxes.

 Turning to the Division's and the Commission's argument that even if the instant license fees and taxes are subject to the provisions of 11 U.S.C. § 362, § 362(b)(4) and (5) operate to except collection of the prepetition fees and taxes from the automatic stay. Section 362(b)(4) and (5) provide:

(b) The filing of a petition ... does not operate as a stay—

(4) under subsection (a)(1) of this section, of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power;

(5) under subsection (a)(2) of this section, of the enforcement of a judgment, other than a money judgment, obtained in an action or proceeding by a governmental unit to enforce such governmental unit's police or regulatory power.

The legislative history of this section is instructive as to its purpose:

Paragraph (4) excepts commencement or continuation of actions and proceedings by governmental units to enforce police or regulatory powers. Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, environmental protection, consumer protection, safety, or similar police or regulatory laws, or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay. Paragraph (5) makes clear that the exception extends to permit an injunction and enforcement of an injunction, and to permit the entry of a money judgment, but does not extend to permit enforcement of a money judgment. Since the assets of the debtor are in the possession and control of the bankruptcy court, and since they constitute a fund out of which all creditors are entitled to share, enforcement by a governmental unit of a money judgment would give it preferential treatment to the detriment of all other creditors.

H.R. No. 595, 95th Cong., 2d Sess. (1977), *reprinted in* 1978 U.S.Cong. & Ad.News, 5787, 6299.

This court recognizes that the enforcement of the New Jersey Casino Control Act is a valid exercise of the state's police power. *See, Knight v. Margate,* 86 N.J. 374, 431 A.2d 833 (1981). In November, 1976, a majority of the voters of the State of New Jersey voted in favor of an amendment to the New Jersey Constitution which

legalized gambling. *Id.* at 380, 431 A.2d 833. Accordingly, the Casino Control Act was enacted by the New Jersey Legislature in 1977. The regulatory scheme contained in the Act is, "both comprehensive and minutely elaborate." *Id.* at 381, 431 A.2d 833. This is so because pursuant to N.J. Stat.Ann. § 5:12–1(b)(6), "[a]n integral and essential element of the regulation and control of such casino facilities by the State rests in the public confidence and trust in the credibility and integrity of the regulatory process and of casino operations."

The purpose of the Act is to carry out the state's public policy concerning casino gambling. That policy is set forth in N.J. Stat.Ann. § 5:12–1(b). As summarized by the court in *Knight v. Margate*, 86 N.J. 374, 431 A.2d 833 (1981), the State of New Jersey is concerned with the promotion of "the tourist, resort, recreational and convention industry of the State, the need to restore, rehabilitate and redevelop Atlantic City and the potential contribution of this new industry to the economic structure, general welfare, health and prosperity of the State and its inhabitants." 86 N.J. at 381, 431 A.2d 833. *See also*, N.J.Stat.Ann. § 5:12–1.

■ It is equally clear that the casino license at issue herein, and the rights given to the debtor-in-possession emanating therefrom, including the legal right to operate its casino business, constitute an interest protected by the automatic stay provisions of 11 U.S.C. § 362. *See, NLV Casino Corp., A Nevada Corp., d/b/a Silverbird Hotel & Casino, Silver City Casino and Silver Nugget Hotel*, No. BK–LV 80–889 (Bkrtcy.D.Nev. August 19, 1981).

In the case of *In re Jacobsmeyer*, 13 B.R. 298, 5 C.B.C.2d 38 (Bkrtcy.W.D.Mo. 1981), the debtors were engaged in the retail sale of alcoholic beverages. As a result of prepetition debts, and pursuant to state law, wholesale liquor distributors refused to fill the debtors' orders. The debtors contended that they would be unable to reorganize their financial affairs if they were not permitted to purchase stock for sale. Accordingly, the debtors sought to

have the wholesalers held in contempt for violation of 11 U.S.C. § 362.

The defendant in *In re Jacobsmeyer* contended that enforcement of the regulations at issue was an exercise of police power within the meaning of 11 U.S.C. § 362(b)(4), and thus was excepted from the operation of the automatic stay. The *Jacobsmeyer* court determined that the state regulations affected the welfare and morals of the public and only indirectly protected pecuniary interests. However, the court noted that enforcement of the state regulations would be in direct conflict with the United States Bankruptcy Code, and thus it enjoined the enforcement of the state regulations. In so holding, the court stated:

> here the regulations, if enforced, would require debtors to pay prepetition debts as a condition of performing under a Chapter 13 plan. Both the treatment of prepetition debts and performance in accordance with a plan under Chapter 13 form the basis of much of the Bankruptcy Code and are of fundamental concern to the Court in its administration of proceedings under the Code. Thus, the Court cannot allow state law to determine the treatment of prepetition debts except insofar as the differences in treatment are authorized by the Code. The enforcement of this regulation would cause debtor to pay in full certain unsecured debts, resulting in preferential or discriminatory treatment, or both, of some creditors in relation to others.

13 B.R. 298, 5 C.B.C.2d at 42–43.

In the case of *In re Aegean Fare, Inc.*, 35 B.R. 923 (Bkrtcy.D.Mass.1983), the debtor was a restaurant owner. After the debtor's restaurants were seized by the Commonwealth of Massachusetts due to the debtor's failure to pay meals taxes, the debtor filed a petition under Chapter 11 of the Bankruptcy Code. Subsequently, the court ordered the Commonwealth to turnover possession of the premises to the debtor. The Licensing Board for the City of Boston (Board) refused to renew the debtor's liquor licenses pursuant to a state statute requiring a licensee in bankruptcy ei-

ther to pay prepetition taxes or to develop a repayment plan with the Department of Revenue as a prerequisite to license renewal. The *In re Aegean Fare* court found that the sole reason for the refusal to renew the licenses was the debtor's failure to pay prepetition meals taxes, and his failure to enter into a repayment plan with the Commonwealth.

The debtor in *In re Aegean Fare* argued that the Board's action in refusing to renew his licenses was a direct violation of the automatic stay provision contained in 11 U.S.C. § 362. The Board, however, contended that its issuance of liquor licenses was exempt from the automatic stay by reason of 11 U.S.C. § 362(b)(4). The court rejected the Board's argument, and found that the purpose and effect of the state law was to frustrate basic policies of the Federal Bankruptcy Code. Accordingly, the court in *In re Aegean Fare* stayed the enforcement of the state law, finding the enforcement of the law under the circumstances to be violative of the Supremacy Clause of the United States Constitution. 35 B.R. at 928.

The Third Circuit, in the case of *Penn Terra Limited v. Department of Environmental Resources, Commonwealth of Pennsylvania,* 733 F.2d 267 (3d Cir.1984) (*Penn Terra*), was called upon to determine whether a conflict existed between the United States Bankruptcy Code and state environmental laws promulgated by the Commonwealth of Pennsylvania. In *Penn Terra,* the Commonwealth of Pennsylvania was attempting to force a company, which had filed a petition for relief under the Bankruptcy Code, to correct violations of state environmental laws. Correction of the violations, however, would deplete the assets of the corporation, which assets otherwise would be used to repay the debts of general creditors.

In determining whether the automatic stay provisions of 11 U.S.C. § 362 operated to preclude the state from enforcing its environmental laws, the *Penn Terra* court examined the underlying policies of the Bankruptcy Code and of the subject envi-

ronmental laws. The court also considered the general policies regarding pre-emption. The court noted that protection and preservation of a debtor's assets, so that the funds of a bankruptcy estate may be equitably distributed amongst creditors without unfair preference, is central to the statutory scheme of the Bankruptcy Code. 733 F.2d at 269 and 278. The court further noted the important purposes of the state's environmental laws, which are, the protection and preservation of the state's natural resources and the correction of damage to the environment by those who cause harm thereto. *Id.* at 269. Finally, the court acknowledged that respect must be given to the independent sovereignty of the states, and that federal supremacy must not be lightly invoked. *Id.* at 273.

The *Penn Terra* court established that the enforcement of Pennsylvania's environmental laws was clearly an exercise of the state's police and regulatory power as provided in 11 U.S.C. § 362(b)(4). However, the *Penn Terra* court determined that the injunction ordering the debtor to rectify harmful environmental hazards was not the enforcement of a money judgment, and thus was not encompassed by the automatic stay provision of 11 U.S.C. § 362(a). 733 F.2d at 278–279. In dicta, the *Penn Terra* court noted that, "in some individual situations, the exercise of State power, even for the protection of the public health and safety, may run so contrary to the policy of the Bankruptcy Code that it should not be permitted." 733 F.2d at 273.

The *Penn Terra* court indicated that even where state action is excepted from the automatic stay pursuant to 11 U.S.C. § 362(b)(4), the bankruptcy court may, in its discretion, issue an injunction under 11 U.S.C. § 105. The court noted that Congress explicitly considered 11 U.S.C. § 105 when it excepted government regulation from the automatic stay. Accordingly, the *Penn. Terra* court quoted Senate Report Number 95–989:

Subsection (b) lists seven exceptions to the automatic stay. The effect of an

exception is not to make the action immune from injunction.

The court has ample other powers to stay actions not covered by the automatic stay. Section 105, of the proposed title 11, derived from the Bankruptcy Act § 2a(15), grants the power to issue orders necessary or appropriate to carry out the provisions of title 11. The district court and the bankruptcy court as its adjunct have all the traditional injunctive powers of a court of equity [statutory citations omitted]. Stays or injunctions issued under these other sections will not be automatic upon commencement of the case, but will be granted or issued under the usual rules for the issuance of injunctions. By excepting an act or action from the automatic stay, the bill simply requires that the trustee move the court into action, rather than requiring the stayed party to request relief from the stay. There are some actions, enumerated in the exceptions, that generally should not be stayed automatically upon commencement of the case, for reasons of either policy or practicality. Thus, the court will have to determine whether a particular action which may be harming the estate should be stayed.

733 F.2d at 273 (quoting S.Rep. No. 95–989 at 51, 1978 U.S.Code Cong. & Ad.News at 5787, 5837; H.Rep. No. 95–595 at 342, 1978 U.S.Code Cong. & Ad.News at 5963, 6298).

The United States Supreme Court, in the case of *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), commented that the action excepted from the automatic stay in the *Penn Terra* case was, "an effort to enforce the police power statutes of the State, not a suit to enforce a money judgment." *Ohio v. Kovacs,* 105 S.Ct. at 711 n. 11. In discussing the *Penn Terra* decision, the Supreme Court in *Ohio v. Kovacs* explicitly stated, "[t]he automatic stay provision does not apply to suits to enforce the regulatory statutes of the State, but the enforcement of such a judgment by seeking money from the bankrupt ... is another matter." 105 S.Ct. at 711 n. 11.

In *Ohio v. Kovacs,* 469 U.S. 274, 105 S.Ct. 705, 83 L.Ed.2d 649 (1985), the Supreme Court analyzed the obligation of a debtor to comply with an injunction which had been issued prior to the commencement of the bankruptcy proceeding. The injunction, obtained by the State of Ohio, required the debtor to clean up a hazardous waste disposal site. The Supreme Court held that this obligation constituted a "debt" or "liability on a claim" which was subject to discharge under the Bankruptcy Code. Justice O'Connor authored a concurring opinion in the case of *Ohio v. Kovacs,* wherein it was noted that the State of Ohio could protect its interest in the enforcement of its environmental laws by giving clean-up judgments the status of statutory liens or secured claims. 105 S.Ct. at 712.

In the case of *Midlantic National Bank v. New Jersey Department of Environmental Protection,* — U.S. ——, 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (*Midlantic* ), the Supreme Court held that a bankruptcy trustee could not abandon property under 11 U.S.C. § 544(a) in contravention of state statutes or regulations designed to protect the public health or safety from identified hazards. In *Midlantic,* the Supreme Court stated:

'Thus, where a governmental unit is suing a debtor to prevent or stop violation of fraud, *environmental protection,* consumer protection, *safety, or similar police or regulatory laws,* or attempting to fix damages for violation of such a law, the action or proceeding is not stayed under the automatic stay.'

106 S.Ct. at 761 (quoting H.R.Rep. No. 95–595, p. 343 (1977)). The Supreme Court, however, also noted that the exception to the automatic stay contained in 11 U.S.C. § 362(b)(5) permits the government to enforce " 'nonmonetary' judgments against a debtor's estate." 106 S.Ct. at 761.

■ In the matter presently before the court, the Division submitted a letter brief dated April 2, 1986. Therein, the Division addressed the exception to the automatic stay contained in 11 U.S.C. § 362(b)(4).

The Division argued that, if the governmental action at issue relates primarily to the public health, safety, or welfare and not to the protection of a pecuniary interest in the property of the debtor, then 11 U.S.C. § 362(b)(4) operates to permit the action. In support of this proposition the Division cited the following cases: *United States v. Standard Metals Corp.*, 49 B.R. 623 (D.Colo.1985); *In re Charter First Mortgage, Inc.*, 42 B.R. 380 (Bkrtcy.D.Or. 1984); *In re Dervos*, 37 B.R. 731 (Bkrtcy.N. D.Ill.1984); *In re Greenwald*, 34 B.R. 954 (Bkrtcy.S.D.N.Y.1983); *In re Sampson*, 17 B.R. 528 (Bkrtcy.D.Conn.1982). This court rejects the conclusion that if governmental action relates primarily to public health, safety or welfare, 11 U.S.C. § 362(b)(4) perfunctorily excepts the action from the automatic stay. It is clear that in establishing whether particular governmental action is exempted from the automatic stay, the specific action the government is attempting to carry out must be examined.

In *United States v. Standard Metals Corp.*, 49 B.R. 623 (D.Colo.1985), the United States sought to obtain the entry of a money judgment against the debtor. Prior to the filing of a petition in bankruptcy, the debtor had been charged with violations of the Clean Water Act. A stipulation and settlement had been entered into regarding these charges, pursuant to which the debtor paid the United States $25,000.00. An additional $25,000.00 fine had been suspended so long as the debtor complied with the specifications which were set forth in the stipulation. The debtor allegedly violated the stipulation, and the United States sought payment of the $25,000.00 fine which had been suspended. The court held that the United States' action to fix damages for violation of the environmental protection laws was exempted from the automatic stay by 11 U.S.C. § 362(b)(4). In so holding, the court distinguished between the *entry* of a monetary judgment and the *enforcement* of a monetary judgment. The court also noted that once the judgment was entered, the United States would seek enforcement of the judgment along with other creditors. 49 B.R. at 625.

Likewise, in the case of *In re Charter First Mortgage, Inc.*, 42 B.R. 380 (Bkrtcy. D.Or.1984), the state of Washington filed a complaint against the debtor alleging that the debtor committed violations of the Consumer Protection Act. Subsequently, the debtor filed a petition under Chapter 11 of the Bankruptcy Code. Despite the pendency of the bankruptcy, Washington elected to proceed against the debtor, on the basis that 11 U.S.C. § 362(b)(4) and (5) excepted the state's action from the operation of the automatic stay. The *Charter First Mortgage* court, like the *Standard Metals* court, permitted Washington to proceed to obtain a judgment. However, the *Charter First Mortgage* court explicitly stated that it was not designating the status of any claim Washington may hold against the debtor's estate. 42 B.R. at 384. The *Standard Metals* and *Charter First Mortgage* cases are clearly distinguishable from the matter presently before the court. In both of those cases, the courts permitted governmental units to proceed to obtain judgments against debtors' estates. Neither court made any determination regarding whether or when such judgments would be paid, or regarding the status that the judgments would have vis a vis other creditors of the debtor. In the matter presently before the court, the debtor is seeking to pay, and the Commission is requiring the debtor to pay, the subject fees and taxes.

The case of *In re Dervos*, 37 B.R. 731 (Bkrtcy.N.D.Ill.1984), is completely inapplicable to the matter presently before the court. In *In re Dervos*, employees of the debtors sought to have the automatic stay lifted in order to recover a judgment for restitution entered in a state court criminal proceeding. The criminal proceeding was based upon the debtor's violation of the Illinois Wage Payment and Collection Act. The court held that 11 U.S.C. § 362(b)(4) operated to exempt this action from the automatic stay. In so doing, the court established that in order for 11 U.S.C. § 362(b)(4) to exempt governmental action from the automatic stay, "[i]t must be determined that the proceeding was com-

menced in the interest of the public health, safety or welfare *and that harm would result to the public* if the government action was stayed." 37 B.R. at 734 (emphasis added). The case of *In re Dervos* is clearly distinguishable from the matter presently before the court. In *In re Dervos*, the debtor had committed a criminal violation which had resulted in harm to the general public. In the matter presently before the court, the debtor is seeking to pay prepetition license fees and taxes.

The Division's reliance upon the case of *In re Greenwald*, 34 B.R. 954 (Bkrtcy.S.D. N.Y.1983), is likewise misplaced. In *In re Greenwald*, the Commission of the New York State Department of Health sought relief from the automatic stay in order to complete administrative proceedings against the debtor, a residential health care facility. The administrative proceedings had been commenced prior to the debtor's filing of a petition under Chapter 11 of the Bankruptcy Code. By the administrative proceedings, the Commissioner of the New York State Department of Health sought to establish that the debtor was liable for reimbursement of medicaid overpayments. The court established that there was not a public health or safety issue at stake in *In re Greenwald*, and that accordingly, 11 U.S.C. § 362(b)(4) did not operate to permit the continuation of the administrative proceedings. 34 B.R. at 957. However, the *In re Greenwald* court granted relief from the automatic stay in order to permit the Commissioner of the New York State Department of Health to conclude the administrative proceedings. In so holding, the *In re Greenwald* court noted the following factors: state law required the completion of the administrative process; the debtor's participation in the administrative proceeding would not adversely affect the debtor's successful reorganization; the debtor had sold the residential health care facility and was no longer engaged in its operation, and; the administrative proceeding would not result in the removal of any property from the bankruptcy estate without further order of the bankruptcy court. *Id.* Clearly, *In re Greenwald* is distinguishable from

the case presently before the court. The court in *In re Greenwald* expressly noted that the debtor's successful reorganization would not be affected by the continuation of the administrative proceedings, and that no monies would be removed from the bankruptcy estate without further court proceedings. In the present matter, ESA is seeking to pay prepetition fees and taxes which would deplete the bankruptcy estate. This could have an adverse affect upon ESA's successful reorganization. Furthermore, the completion of the administrative proceeding in *In re Greenwald* would serve to establish the amount of the debtor's liability, and would not result in the debtor having to pay a debt.

In the case of *In re Sampson*, 17 B.R. 528 (Bkrtcy.D.Conn.1982), the state sought postpetition enforcement of the state's automobile financial security statute. The *In re Sampson* court found that the purpose of the subject statute was to protect the pecuniary interests of judgment creditors. Accordingly, the court held that the state's proceedings were stayed pursuant to 11 U.S.C. § 362(a). The court indicated that the design of the state statute was not to keep incompetent drivers off the roads, but that the intended and actual effect of the statute was to protect the pecuniary interests of judgment creditors. 17 B.R. at 531.

Turning to the case presently before the court, Title 11 U.S.C. § 507(a)(7) grants a seventh priority to certain unsecured tax claims of federal, state and local governmental units. The subject taxes due and unpaid as of November 13, 1985 may constitute "a tax on or measured by income or gross receipts" under 11 U.S.C. § 507(a)(7). Even if the taxes are entitled to a priority under 11 U.S.C. § 507, payment of the unsecured tax claims may be made only after payment of claims of higher priority, such as administrative claims and actual and necessary expenses incurred in preserving the estate. *See,* 11 U.S.C. § 503(b) and 507(a)(1). Furthermore, the license fees at issue must be paid in the normal course of priority. Whether

the license fees and taxes at issue are priority claims is reserved for consideration at a later date.

 The Division also argues that the Act may create a "trust fund" with respect to the taxes at issue. According to the "trust fund" theory, the Division claims that the subject gross win taxes are dedicated by the Act to fund certain programs to assist the senior citizens and handicapped citizens of the State of New Jersey and that this fund constitutes property of the State and not property of the debtor-in-possession. In support of this theory, the Division cited the case of *In re Nashville White Trucks, Inc.,* 22 B.R. 578 (Bkrtcy.M. D.Tenn.1982). In the *Nashville White Trucks* case the Commissioner for Revenue for the State of Tennessee (Commissioner) filed a complaint against a debtor. By the complaint, the Commissioner sought a declaratory judgment stating that the automatic stay was unconstitutional as applied to the State of Tennessee, or alternatively, that the automatic stay did not prohibit Tennessee from assessing or collecting delinquent or deficient sales taxes incurred by the debtor while operating under Chapter 11. The Commissioner argued in part that the unpaid sales taxes in question created a trust fund on behalf of the State of Tennessee and thus were not property of the debtor's estate. 22 B.R. at 587. The *Nashville White Trucks* court rejected this argument, and found that a statute which created a trust fund in favor of the governmental taxing agency did not exist. 22 B.R. at 587. The Commissioner in the *Nashville White Trucks* case relied upon the legislative history of § 541 of the Bankruptcy Code, which concerns property of a bankruptcy estate:

'As to withheld taxes, the House amendment deletes the rule in the Senate bill as unnecessary since property of the estate does not include the beneficial interest in property held by the debtor as a trustee. *Under the Internal Revenue Code of 1954 (section 7501), the amounts of withheld taxes are held to be a special fund in trust for the Unit-* *ed States.* Where the Internal Revenue Service can demonstrate that the amounts of taxes withheld are still in the possession of the debtor at the commencement of the case, *then if a trust is created,* those amounts are not property of the estate.'

22 B.R. at 586 (quoting 124 Cong.Rec. H11,114 (daily ed. Sept. 28, 1978) (statement of Rep. Edwards)). Assuming that the Division could demonstrate that a trust fund exists under New Jersey state law, the Division would be compelled to demonstrate that such funds either are in the possession of the debtor-in-possession, or are traceable to an identifiable trust from which payment can be made. *See,* 22 B.R. at 588. The Division has not demonstrated either element to support its trust fund theory.

The United States Supreme Court addressed the issue of a conflict between the former Bankruptcy Act and state legislation in the case of *Perez v. Campbell,* 402 U.S. 637, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971). The state legislation in question in *Perez* was a section of Arizona's Motor Vehicle Safety Responsibility Act, which provided for the suspension of the license of a driver involved in a motor vehicle accident, and the suspension of the registration of the accident vehicle, until security, sufficient to satisfy any judgment which might be obtained for damages resulting from the accident was deposited. Another provision of the Motor Vehicle Safety Responsibility Act provided that a discharge in bankruptcy would not relieve the debtor from any requirements of the Act. Furthermore, pursuant to Arizona law, once an individual's license and registration had been suspended, they remained suspended and no other license or registration could be issued in the same name, until the individual, in addition to satisfying the judgment debt, gave proof of future financial responsibility.

The *Perez* court set forth a two step test for determining whether a state statute and a federal statute are in conflict so as to render the state statute invalid under the

Supremacy Clause. Pursuant to the test, the statutes at issue must first be construed, and next the statutes must be compared to determine whether a conflict exists. Applying this test to the facts before it, the *Perez* court determined that the purpose of the state automobile regulations was to protect the public from financial hardship which could result from the negligence of financially irresponsible automobile operators. With regard to the Bankruptcy Act, the *Perez* court established that its purpose was to provide debtors with " 'a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.' " 402 U.S. at 648, 91 S.Ct. at 1710 (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).

In applying the second step of the two-prong test, the *Perez* court maintained that its function was to determine whether the state statute " 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " 402 U.S. at 649, 91 S.Ct. at 1711 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941)). Ultimately, the court concluded that the statutes were in conflict, and that thus, the automobile regulations were constitutionally invalid. 402 U.S. at 656, 91 S.Ct. at 1714.

Section 525 of the Bankruptcy Code codifies the Supreme Court's decision in *Perez v. Campbell*. Title 11 U.S.C. § 525(a) provides in relevant part:

a governmental unit may not deny, revoke, suspend, or refuse to renew a license, permit, charter, franchise, or other similar grant to, condition such a grant to, discriminate with respect to such a grant against, deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been a debtor under this title or a bankrupt or a debtor under the Bankruptcy Act, or another person with whom such bankrupt or debtor has been associated, solely because such bankrupt or debtor is or has been a debtor under this title or a bankrupt or debtor under the Bankruptcy Act, has been insolvent before the commencement of the case under this title, or during the case but before the debtor is granted or denied a discharge, or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act.

The legislative history of 11 U.S.C. § 525 indicates that the list of forms of discrimination contained in 11 U.S.C. § 525 is not intended to be limiting:

The enumeration of various forms of discrimination against former bankrupts is not intended to permit other forms of discrimination. The courts have been developing the Perez rule. This section permits further development to prohibit actions by governmental or quasi-governmental organizations that perform licensing functions ... or by other organizations that can seriously affect the debtor's livelihood or fresh start ...

The effect of the section, and of further interpretations of the Perez rule, is to strengthen the anti-reaffirmation policy found in § 524(b). Discrimination based solely on nonpayment could encourage reaffirmations, contrary to the expressed policy.

S.Rep. No. 989, 95th Cong., 2d Sess., *reprinted in* 1978 U.S.Code Cong. & Ad. News 5787, 5867.

"Governmental unit" is defined by the Bankruptcy Code as follows:

'governmental unit' means United States; State; Commonwealth; District; Territory; municipality; foreign state; department, agency, or instrumentality of the United States, a State, a Commonwealth, a District, a Territory, a municipality, or a foreign state; or other foreign or domestic government.

11 U.S.C. § 101(24). The Commission is clearly within the scope of this statutory definition.

The purpose of 11 U.S.C. § 525 is to protect a debtor's means of earning a

living or pursuing a livelihood. Accordingly, a governmental unit may not discriminate against an individual or entity so as to frustrate the fresh start policies of the Bankruptcy Code, simply because the individual or entity has filed a petition under title 11 of the Bankruptcy Code. *See, Matter of Anderson*, 15 B.R. 399, 400 (Bkrtcy. S.D.Miss.1981). Thus, whenever state regulations frustrate the underlying purposes of the Bankruptcy Code, they are violative of 11 U.S.C. § 525 and may not be enforced against a debtor. *Id.* In *Matter of Anderson*, 15 B.R. 399 (Bkrtcy.S.D.Miss. 1981), the court precluded the enforcement of a state regulation against debtors pursuant to 11 U.S.C. § 525. The regulation at issue in *Matter of Anderson* prohibited the renewal of the debtors' liquor license due to their failure to pay monies owed to the Mississippi State Tax Commission. The court found that the non-renewal of the liquor license would preclude the reorganization of the debtors since it would force them to close their package retail liquor store and lose their means of earning a living. Accordingly, the court ordered the State Tax Commission to renew the debtors' liquor license and to continue to supply the debtors with alcoholic beverages on a cash basis.

In the case of *In re William Tell II, Inc.*, 38 B.R. 327 (N.D.Ill.1983), the court employed 11 U.S.C. § 525 to preclude the enforcement of a state statutory provision against a debtor. In that case, the debtor was engaged in the restaurant, liquor lounge and banquet hall business. Accordingly, the debtor made retail sales of alcoholic beverages and possessed a retail liquor license issued by the State of Illinois and the City of Countryside, Illinois in which the debtor operated its business.

On May 14, 1980, after a hearing, the debtor's liquor license was revoked by the State of Illinois Liquor Control Commission (Illinois Commission), because of the debtor's failure to pay outstanding state retailers' occupation tax. Since the debtor's license expired in May, it applied for a renewal of its license, and a new license was granted. On October 8, 1980, after a hear-

ing, this license was also revoked by the Illinois Commission, allegedly due to false statements contained in the license application. The debtor challenged this revocation in the County Circuit Court, and the parties entered into agreements pursuant to which the revocation was stayed so long as the debtor paid its tax arrearages and current taxes pursuant to a repayment plan. The debtor defaulted several times, and on April 7, 1981, the County Circuit Court affirmed the license revocation. On April 10, 1981, the debtor filed a petition under Chapter 11 of the Bankruptcy Code. Thereafter, the debtor filed a motion to have its liquor license restored on the grounds that the enforcement of the state statutory provisions regarding liquor licenses violated 11 U.S.C. § 525. The bankruptcy court ordered the license restored, however, when the license expired, the debtors' application for renewal was denied by the Illinois Commission. The debtor sought relief from the bankruptcy court, which entered an order of renewal. Additionally, the bankruptcy court suspended the operation of Section 122 of the Dram Shop Act contained in the Illinois statutes with respect to the debtor, which statute imposed credit and sales restrictions on retail liquor licensees who were delinquent in certain payments to liquor manufacturers and distributors. According to the order of the bankruptcy court, liquor purveyors could deliver liquor to the debtor on a cash-on-delivery basis. The Illinois Commission appealed these two orders to the district court, alleging that: (1) the enforcement of the license revocation was an exercise of state police and regulatory power which was exempt from the automatic stay by 11 U.S.C. § 362(b)(4), and; (2) its enforcement actions did not improperly discriminate against the debtor under 11 U.S.C. § 525.

The court, in examining the exception to the automatic stay created by 11 U.S.C. § 362(b)(4), stated:

> courts have determined that 'the term "police or regulatory power" refers to the enforcement of state laws affecting

health, welfare, morals, and safety, but not regulatory laws that directly conflict with the control of the *res* or property by the bankruptcy court.'

38 B.R. at 329 (quoting *State of Missouri v. United States Bankruptcy Court*, 647 F.2d 768, 776 (8th Cir.1981), *cert. denied*, 454 U.S. 1162, 102 S.Ct. 1035, 71 L.Ed.2d 318 (1982)). Furthermore, the court noted that even if a state proceeding was not automatically stayed, a bankruptcy court could enjoin governmental conduct under 11 U.S.C. § 525. 38 B.R. at 330.

With respect to the first license revocation, the district court in *In re William Tell II, Inc.*, determined that the Illinois Commission was acting under the state's police power pursuant to 11 U.S.C. § 362(b)(4). However, the court noted that the license had been revoked because of the debtor's failure to pay taxes, and that this issue had been pending in the County Circuit Court when the debtor filed its petition. The court concluded that the Illinois Commission's enforcement of the liquor regulations "did not affect the public health, welfare, morals or safety," and that the proceeding before the Circuit Court was automatically stayed pursuant to 11 U.S.C. § 362. 38 B.R. at 330.

With respect to the second order renewing the debtor's license, the district court relied upon 11 U.S.C. § 525 to uphold the bankruptcy court's decision. The district court upheld the finding of the bankruptcy court that enforcement of the state regulation discriminated against the debtor because the reason for revoking the debtor's license was the debtor's failure to pay certain taxes, which debt would have been dischargeable within the meaning of 11 U.S.C. § 525. 38 B.R. at 331.

■ In the instant matter, the Commission argues that 11 U.S.C. § 525 was not designed to confer a benefit upon a debtor so as to give it preferential treatment to which it would not be entitled otherwise. The Commission further claims that its treatment of ESA would be the same even if ESA were not a debtor in bankruptcy, since the Commission requires all casino licensees to comply with N.J.Stat.Ann. § 5:12–88 by paying outstanding license fees and taxes. The Commission further notes that it does not have the authority to invalidate the Act in the face of a constitutional challenge, and it must treat ESA as it would any other casino license renewal applicant that failed to comply with the Act. In support of these contentions, the Commission relies upon the case of *Duffey v. Dollison*, 734 F.2d 265 (6th Cir.1984).

In *Duffey v. Dollison*, 734 F.2d 265 (6th Cir.1984), the debtors alleged that enforcement of Ohio's Motor Vehicle Financial Responsibility Act as to them was discriminatory and thus violative of 11 U.S.C. § 525. The financial responsibility law required the suspension of driver licenses and registrations of individuals who failed to pay judgments arising out of automobile accidents within thirty days of a written request by the judgment creditor or by the judgment creditor's attorney. Pursuant to the financial responsibility law, driving privileges were to remain suspended for seven years, or until the judgment was stayed or satisfied and proof of financial responsibility was submitted. 734 F.2d at 269. It is noteworthy that a previous version of the financial responsibility statute had been deemed unconstitutional to the extent that it required the payment of a tort judgment entered as a result of an automobile accident as a prerequisite to the restoration of driving privileges. This payment requirement had applied regardless of whether the judgment had been stayed or discharged in bankruptcy. 734 F.2d at 269.

The *Duffey v. Dollison* court held that the new financial responsibility statute, which required individuals who failed to pay judgments arising out of automobile accidents to post proof of financial responsibility as a prerequisite to restoration of their driving privileges, was not preempted by federal bankruptcy law. In reaching its decision, the court distinguished the statutory provision at issue therein from the one at issue in *Perez v. Campbell*. The *Duffey v. Dollison* court stated that in order to

regain privileges, the statute in *Perez v. Campbell* required payment of a judgment, even if its collection was stayed or it was discharged in bankruptcy, while the statute in *Duffey v. Dollison* merely required proof of future financial responsibility. 734 F.2d at 272.

In the instant case, the Commission's requirement that ESA pay prepetition license fees and taxes as a condition of the renewal of its casino license, unlike the statute at issue in *Duffey v. Dollison*, requires the debtor to pay prepetition debts rather than to prove future financial responsibility. Accordingly, while 11 U.S.C. § 525 would not prohibit a governmental unit from requiring a debtor to prove future financial responsibility, the condition of payment of the subject fees and taxes, as applied to the debtor herein, violates 11 U.S.C. § 525. *See, Duffy v. Dollison*, 734 F.2d 265 (6th Cir.1984); *Matter of Alessi*, 12 B.R. 96 (Bkrtcy.N.D.Ill.1981).

In conclusion, the debtor, to comply with the dictates of the Commission and to preserve its casino license would have to pay prepetition license fees and taxes, which is prohibited by 11 U.S.C. § 362 and 11 U.S.C. § 525. Alternatively, the debtor would have to obtain some relaxation of this condition through a subsequent hearing before the Commission. This condition of the relicensure creates a clear conflict between the regulatory scheme of the Casino Control Act and the priorities scheme contained in the United States Bankruptcy Code. The Commission's conditioning the debtor's relicensure upon the payment of prepetition license fees and taxes stands as a clear obstacle to the purposes and objectives of Congress as contained in the Bankruptcy Code and to the reorganization provisions of Chapter 11 of the Bankruptcy Code.

Accordingly, the Commission is permanently enjoined from enforcing the license condition which requires the payment by ESA of prepetition license fees and taxes.

An order consistent with this opinion was entered on June 26, 1986.